United States Court of Appeals,

Eleventh Circuit.

No. 94-3145.

Scott D. LEVINE, M.D., Plaintiff-Appellant,

v.

CENTRAL FLORIDA MEDICAL AFFILIATES, INC.; Healthchoice, Inc.; Sand Lake Hospital; Orlando Regional Healthcare System, Inc. f/k/a Orlando Regional Medical Center, Defendants-Appellees.

Jan. 23, 1996.

Appeal from the United States District Court for the Middle District of Florida. (No. 93-153-CIV-ORL-22), Anne C. Conway, Judge.

Before ANDERSON and CARNES, Circuit Judges, and OWENS[*], Senior District Judge.

CARNES, Circuit Judge:

Dr. Scott Levine, the plaintiff, appeals from the district court's grant of summary judgment in favor of the defendants on his state and federal antitrust claims. The four defendants are Healthchoice, Inc., a preferred provider organization ("PPO"); Central Florida Medical Affiliates, Inc. ("CFMA"), a physicians advocacy group organized to supply physician providers to the Healthchoice PPO; Sand Lake Hospital; and Orlando Regional Healthcare System, Inc. ("ORHS"), the hospital's parent corporation. The incidents giving rise to the lawsuit are Dr. Levine's unsuccessful attempt to gain provider membership in Healthchoice and CFMA, and the temporary suspension of his staff privileges at Sand Lake Hospital. Because we conclude that there is no genuine issue of material fact about Dr. Levine failing to

---

[*]Honorable Wilbur D. Owens, Jr., Senior U.S. District Judge for the Middle District of Georgia, sitting by designation.

establish any anticompetitive effect resulting from being denied membership in Healthchoice and CFMA or from his hospital suspension, and that the defendants are accordingly entitled to judgment as a matter of law, we affirm the district court's grant of summary judgment in their favor.

## I. BACKGROUND

Because the case has come to us on appeal of summary judgment, we construe the facts in the light most favorable to the nonmovant, in this case Dr. Levine. *Forbus v. Sears Roebuck & Co.,* 30 F.3d 1402, 1403 n. 1 (11th Cir.1994), *cert. denied,* --- U.S. ----, 115 S.Ct. 906, 130 L.Ed.2d 788 (1995). The following is a summary of the facts as viewed in the light most favorable to Dr. Levine.

Dr. Scott D. Levine is an internist. In 1989, a year after completing his residency in California, Dr. Levine moved to Orlando, Florida to begin private practice. Although Dr. Levine explored opportunities to join established medical practices as a salaried employee,[1] he ultimately decided to become a sole practitioner. He began his practice in the summer of 1989.

When Dr. Levine began his practice, he sought, and was granted, provisional staff privileges at the ORHS hospitals.[2] ORHS is a nonprofit organization that owns and operates five Orlando area hospitals: Orlando Regional Medical Center ("ORMC"); Arnold Palmer Hospital for Children and Women; Sand Lake Hospital; St.

---

[1]One physician offered Dr. Levine $60,000 a year plus benefits, and another offered him $100,000 a year plus benefits. Neither offer appealed to Dr. Levine.

[2]ORHS was formerly known as the Orlando Regional Medical Center, a name the organization shared with one of its unincorporated hospital facilities.

Cloud Hospital;  and South Seminole Hospital (ORHS owns only half of it).  Dr. Levine primarily exercised his staff privileges at Sand Lake Hospital because it is located across the street from his office.  Around October of 1990, after Dr. Levine had successfully exercised his provisional staff privileges for more than a year, ORHS granted him full active staff privileges.  During 1990 and 1991, Dr. Levine also applied for, and was granted, staff privileges at several other Orlando area hospitals:  the Florida Hospital system, which operates five hospitals;  Glenbeigh Hospital;  Charter of Orlando South Hospital;  and Health Central.

When Dr. Levine acquired provisional staff privileges at Sand Lake Hospital, he agreed to have his name put on the emergency room ("ER") call list.  Each day doctors of various specialties would be "on call" in the ER, which means that if a patient came to the ER and needed to see, for example, an internist, the hospital would contact the internist whose name appeared on the call list for that day.  Dr. Levine found that being on the ER call list provided an effective means of building his new practice, and so during his early years in Orlando, he asked to be placed on the list as often as possible.  Many of the patients Dr. Levine treated in the ER would continue to see him as their internist after leaving the hospital.  In addition, these patients would often refer Dr. Levine new patients.  Dr. Levine's strategy proved lucrative;  in 1990, his first full year of private practice, Dr. Levine's pre-tax net earnings were $553,176—more than twice the average earnings of Florida internists in private practice that year, according to studies conducted by the American Medical Association.

A. THE DENIAL OF HEALTHCHOICE PPO MEMBERSHIP TO DR. LEVINE

In addition to being on the ER call list, another method of building his practice that Dr. Levine explored was the possibility of becoming a physician provider of Healthchoice[3] and CFMA.[4] Healthchoice is a PPO, which is a form of managed health care coverage in which physicians agree to accept no more than a maximum allowable fee for services rendered to plan enrollees in exchange for a potentially higher volume of patients. CFMA is a physicians' advocacy group that was organized to supply the Healthchoice PPO with a panel of physician providers. Dr. Levine had heard that Healthchoice was one of the largest PPOs in the Orlando area, and he believed that Healthchoice patients accounted for approximately twenty percent of some member physicians' practices. Dr. Levine had also heard that Healthchoice physicians were, in his words, "very pleased with what they're getting as reimbursement."

Dr. Levine sought physician provider membership with Healthchoice several times between 1989 and 1990, but Healthchoice denied his request for membership each time, explaining that it did not need any more internists in his geographical area. Believing (incorrectly) that in order to be a member of Healthchoice, one had to be a member of CFMA, Dr. Levine also inquired about membership in CFMA. However, Dr. Levine's telephone call to CFMA was answered by a Healthchoice employee, and Dr. Levine was again told that it did not need any more internists in his area.

---

[3]Healthchoice is owned by Healthnet Services, Inc., which is a for-profit wholly owned subsidiary of ORHS.

[4]For a detailed description of how Healthchoice and CFMA operate, see *infra* pp. ---- - ----.

During his first few years of practice, Dr. Levine pursued provider memberships in three other Orlando area PPOs—Health Advantage, Alta, and Aetna. He joined the Health Advantage PPO because it was part of the group health coverage he had purchased for himself and his office staff. When his own health coverage administrators switched to the Alta PPO, Dr. Levine then joined Alta as well. Dr. Levine also applied to become a physician provider of Aetna at the request of a patient, but Aetna denied his application for the same reason that Healthchoice had—Aetna already had enough internists in Dr. Levine's area. Although Dr. Levine received numerous solicitations from other area PPOs inviting him to become a physician provider, he turned down each of those offers.

In January of 1991, Dr. Levine's practice was so busy that he placed an advertisement in a medical journal to hire a physician as a salaried employee. However, because of events that transpired at Sand Lake Hospital that same month, Dr. Levine decided not to hire another physician for his practice.

B. THE SUSPENSION OF DR. LEVINE'S STAFF PRIVILEGES AT SAND LAKE HOSPITAL

In January of 1991, Cathy Canniff-Gilliam, the Executive Director of Sand Lake Hospital, removed Dr. Levine from the ER call list. A few days later, the executive committee of Sand Lake Hospital voted to suspend Dr. Levine's remaining staff privileges pending investigation of various patient care concerns.[5] The

---

[5]Dr. Levine's staff privileges at Sand Lake Hospital included the privilege of admitting patients to the hospital and treating them during their stay, and the privilege of being on ER call and treating patients through the ER.

executive committee reported these concerns to the ORHS credentials committee, which then assembled an investigative committee to review the incidents giving rise to those concerns. After interviewing Dr. Levine and reviewing his patients' charts, the investigative committee reported its findings to the credentials committee. The credentials committee reviewed the report and recommended to the Sand Lake Hospital executive committee that it place Dr. Levine on probation for six months and that it proctor his performance of certain procedures several times each. The executive committee decided to increase the probationary period to one year, but other than that, it adopted the credentials committee's recommendations. Dr. Levine appealed the executive committee's decision, and in June of 1991, ORHS appointed a hearing panel to review the executive committee's decision. The panel affirmed the executive committee's decision to impose probationary conditions upon Dr. Levine.

Subject to his new probationary status, Dr. Levine regained admitting privileges in May of 1991, and ER call privileges in the fall of 1991, although he chose to wait until mid-December to resume being on ER call. Dr. Levine still has not met the procedure proctoring requirements necessary to regain full staff privileges, because he has chosen to admit his patients to Florida Hospital, which is the largest hospital system in Orlando, and as a result he has not performed the procedures that were to be proctored at Sand Lake Hospital.

During the time that his staff privileges were suspended at

Sand Lake Hospital,[6] Dr. Levine maintained staff privileges at Glenbeigh Hospital, Charter Hospital, Health Central Hospital, and Florida Hospital (which includes five campuses). However, he has chosen not to exercise his staff privileges at Glenbeigh and Charter, purportedly due to the time he has spent pursuing this lawsuit.

The suspension of Dr. Levine's staff privileges began in the third week of January in 1991. Notwithstanding his suspension, in 1991 Dr. Levine earned $724,722, which is $171,546 (or thirty-one percent) more than he had earned the previous year when his Sand Lake Hospital staff privileges were not suspended.

## II. PROCEDURAL HISTORY

In March of 1993 Dr. Levine filed a complaint in the United States District Court for the Middle District of Florida against CFMA, Healthchoice, Sand Lake Hospital, and ORHS, alleging violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2 (1988), and violations of various state laws.[7] In Count 1 of his complaint, Dr. Levine claimed that CFMA and Healthchoice violated section 1 of the Sherman Act by maintaining a closed panel of physicians and by denying him physician provider membership. Dr. Levine claimed in Count 2 that all of the defendants conspired

---

[6]Dr. Levine alleges that his staff privileges were suspended at ORMC as well as Sand Lake Hospital; however, we have found no evidence in the record to support that allegation.

[7]In addition to the federal antitrust claims, Dr. Levine's complaint included the following: claims under Florida's antitrust statutes; a claim for tortious interference with business relations; a claim under Florida's general tort statute; and a claim for breach of contract. Dr. Levine filed a parallel suit in state court which has been held in abeyance pending resolution of this case in federal court.

to, and did, monopolize the market for patients "whose employers have contracted with Healthchoice," in violation of section 2 of the Sherman Act.  In Count 3 Dr. Levine claimed that ORHS and Sand Lake Hospital engaged in a concerted refusal to deal in violation of section 1 of the Sherman Act by suspending his staff privileges.[8]  Dr. Levine sought monetary damages in excess of $100,000 and injunctive relief pursuant to sections 4 and 16 of the Clayton Act.[9]

In June of 1994, after extensive discovery, each defendant filed a motion for summary judgment as to the state and federal antitrust claims.  The district court granted the defendants' motions, and, declining to exercise its supplemental jurisdiction, the court dismissed the remaining state law claims without prejudice.  Dr. Levine now appeals the district court's grant of summary judgment.

### III. DISCUSSION

In granting the defendants' motions for summary judgment, the district court held that Dr. Levine lacked standing to prosecute his antitrust claims, and in the alternative that his claims lacked

---

[8]Counts 1 through 3 also included Dr. Levine's state antitrust law claims.

[9]Section 4 of the Clayton Act authorizes a private action for treble damages and provides, in pertinent part:  "[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor...."  15 U.S.C.A. § 15(a) (West 1995).  Section 16 authorizes a private action for injunctive relief, and provides, in pertinent part: "Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws...."  15 U.S.C.A. § 26 (West 1973).

merit. As to Dr. Levine's section 1 and 2 claims against Healthchoice and CFMA for denying him membership, and his section 2 claim against ORHS and Sand Lake Hospital for their part in the alleged conspiracy to monopolize, the district court held he lacked standing because he was not an efficient enforcer of the antitrust laws, and in the alternative, that those claims were without merit because he had failed to prove the defendants' market power. As to Dr. Levine's section 1 claim against ORHS and Sand Lake Hospital for suspending his staff privileges, the district court held that he lacked standing because he had failed to establish that his suspension resulted in any antitrust injury, and in the alternative, that the claims lacked merit because of Dr. Levine's failure to show any anticompetitive effect arising out of his suspension.

We need not decide whether Dr. Levine has met the requirements for standing as to any of his antitrust claims, because as to each one he has failed to establish any violation of the antitrust laws.[10] Because we believe Dr. Levine has failed to prove any anticompetitive effect resulting from the defendants' behavior, as is required under the Sherman Act, we follow the advice of Professors Areeda and Hovenkamp and decide this case on the merits rather than on standing:

> When a court concludes that no violation has occurred, it has no occasion to consider standing.... An increasing number of courts, unfortunately, deny standing when they really mean that no violation has occurred. In particular, the antitrust

---

[10]Because we hold that Dr. Levine has failed to establish any antitrust violation, we also need not consider whether he has established standing to sue for injunctive relief under section 16 of the Clayton Act.

injury element of standing demands that the plaintiff's alleged injury result from the threat to competition that underlies the alleged violation. A court seeing no threat to competition in a rule-of-reason case may then deny that the plaintiff has suffered antitrust injury and dismiss the suit for lack of standing. Such a ruling would be erroneous, for the absence of any threat to competition means that no violation has occurred and that even suit by the government—which enjoys automatic standing—must be dismissed.

2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 360f, at 202-03 (rev. ed. 1995) (footnotes omitted). This approach is consistent with our precedents. We have ruled on the merits of an antitrust claim without ever deciding whether the plaintiff had antitrust standing. *E.g., Aladdin Oil Co. v. Texaco, Inc.,* 603 F.2d 1107, 1109 n. 2 (5th Cir.1979) (assuming standing and affirming grant of summary judgment for defendants because plaintiff failed to establish antitrust violations); *Hardwick v. Nu-Way Oil Co.,* 589 F.2d 806, 807 n. 3 (5th Cir.) (same), *cert. denied,* 444 U.S. 836, 100 S.Ct. 70, 62 L.Ed.2d 46 (1979); *see also Todorov v. DCH Healthcare Auth.,* 921 F.2d 1438, 1446-47 (11th Cir.1991) (reaching the merits of an antitrust claim even though the plaintiff lacked standing to bring the claim).

We review a district court's grant of summary judgment *de novo. Flores v. Carnival Cruise Lines,* 47 F.3d 1120, 1122 (11th Cir.1995). Viewing the facts in the light most favorable to the nonmovant, we must determine whether there exists a genuine issue of material fact or whether the movant is entitled to judgment as a matter of law. *Tisdale v. United States,* 62 F.3d 1367, 1370 (11th Cir.1995).

A. THE SECTION 1 CLAIMS

Section 1 of the Sherman Act provides that "[e]very contract,

combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C.A. § 1 (West 1973). A section 1 plaintiff must prove an agreement between two or more persons to restrain trade, because unilateral conduct is not illegal under section 1. *See, e.g., Fisher v. City of Berkeley, Cal.,* 475 U.S. 260, 266, 106 S.Ct. 1045, 1049, 89 L.Ed.2d 206 (1986) ("Even where a single firm's restraints directly affect prices and have the same economic effect as concerted action might have, there can be no liability under § 1 in the absence of agreement."); *Monsanto Co. v. Spray-Rite Serv. Corp.,* 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984); *Todorov,* 921 F.2d at 1455. Thus, the first element of a section 1 claim is proof of an agreement to restrain trade.

However, not every agreement that restrains competition will violate the Sherman Act. The Supreme Court long ago determined that section 1 prohibits only those agreements that *unreasonably* restrain competition, *Standard Oil Co. v. United States,* 221 U.S. 1, 58-64, 31 S.Ct. 502, 515-17, 55 L.Ed. 619 (1911), thus, the unreasonableness of the agreement is the second element of a section 1 claim. In identifying which agreements unreasonably restrain competition, the Supreme Court has held that certain kinds of agreements are unreasonable per se, such as agreements among direct competitors to fix prices or to restrict output. *E.g., United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 224-26 n. 59, 60 S.Ct. 811, 845-46 n. 59, 84 L.Ed. 1129 (1940). The only inquiry in such cases is whether there was an agreement to do so, because

the unreasonableness of the restraint is presumed. *See, e.g., Arizona v. Maricopa County Medical Soc'y,* 457 U.S. 332, 344-45, 102 S.Ct. 2466, 2473-74, 73 L.Ed.2d 48 (1982); *United States v. Trenton Potteries Co.,* 273 U.S. 392, 397-98, 47 S.Ct. 377, 379, 71 L.Ed. 700 (1927). Agreements that do not fit within an established per se category are analyzed under the "rule of reason," i.e., courts will engage in a comprehensive analysis of the agreement's purpose and effect to determine whether it unreasonably restrains competition. *E.g., Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.,* 441 U.S. 1, 24-25, 99 S.Ct. 1551, 1565, 60 L.Ed.2d 1 (1979).

**1. The Section 1 Claim Against Healthchoice and CFMA**

A more detailed description of how the Healthchoice PPO and CFMA operate is necessary to a discussion of the merits of Dr. Levine's claims against those two defendants.

*a) How Healthchoice and CFMA Operate*

Healthchoice markets to healthcare payors a panel of select healthcare providers—which includes physicians, hospitals, pharmacies, and durable medical equipment companies. The payors consist of employers, insurance companies, third party administrators, or governmental agencies. Healthchoice maintains a limited panel of providers who have agreed to accept no more than a maximum allowable fee for services rendered or products furnished to Healthchoice enrollees. These maximum fees may or may not be lower than the provider's ordinary charges. In addition, the providers agree to be subject to Healthchoice's utilization review and quality control program. Providers are willing to accept these

terms because Healthchoice membership may increase their number of patients.

Healthchoice individually negotiates with each payor to arrive at a schedule of fees that the payor is willing to pay for various medical products and services. Healthchoice presents each prospective payor with its schedule of fees, and the payor is then free to negotiate with Healthchoice for lower fees. Several steps are involved in computing Healthchoice's schedule of fees. Every medical product and service is identified according to a standardized "Current Procedural Terminology" code ("CPT code"). Healthchoice assigns to each CPT code, of which there are approximately 9,000, a unit value that it adapts from information provided by Medicare. The unit value is a reflection of the approximate cost of resources required for each procedure or product. Healthchoice then assigns a monetary conversion factor to each major medical specialty, e.g., medicine has one conversion factor, and radiology has another; these conversion factors are collectively called the "Master Payor Rate Schedule." The Healthchoice fee schedule is computed by multiplying the conversion factors on the Master Payor Rate Schedule by the unit values assigned to the CPT codes. The resulting schedule of fees, once accepted by the payor, are the maximum that the payor will reimburse a provider for each product or service. Thus, when a payor receives a bill from a provider, it pays the provider the lesser of either the actual charges submitted by the provider, or the maximum allowable fee as reflected in the Healthchoice fee schedule.

Healthchoice does not consult its various providers when it compiles the unit values or the conversion factors. The Healthchoice board of directors has eight members, four of whom are CFMA physicians, but when that board approves the Master Payor Rate Schedule, those four physician board members are not allowed to participate. In its contract with a provider, Healthchoice includes the conversion factors, but it does not include the unit values. Thus, the provider does not know the exact fees that Healthchoice has negotiated with the payors. Instead, the contract with each provider includes only an example of how a fee would be calculated for one of the more commonly used CPT codes. Should a provider request more information about the fee schedule, Healthchoice will give the provider a few more illustrations. The provider is always allowed to "opt out" of a contract with a given payor if it finds the fee reimbursement unacceptable.[11]

A Healthchoice enrollee is free to use non-Healthchoice providers; however, the enrollee's payor may require the enrollee to pay a higher deductible, and may require the enrollee to pay for any provider charges over the payor's maximum allowable reimbursement. The payors individually design the terms of these benefit packages—Healthchoice itself does not create financial disincentives for any enrollees who choose to use non-Healthchoice providers.

The main source of Healthchoice's physician providers is CFMA,

---

[11]Healthchoice charges each payor a nominal monthly fee for each of the payor's enrolled employees. In 1994, the fee was approximately $1.25 per month for each enrollee. Healthchoice has never earned a profit.

which was organized to supply Healthchoice with a panel of physician providers. Four members of CFMA sit on the board of directors of Healthchoice. However, Healthchoice does not contract only with CFMA for physician providers; many of Healthchoice's physician providers are not members of CFMA. Healthchoice providers, whether or not members of CFMA, are allowed to participate in other PPOs, and most of them do participate in several different PPOs.

For a short period of time after Healthchoice began doing business, it accepted applications from any provider who wanted to apply. Thereafter, Healthchoice decided to limit the size of its panel, and so it adopted a need-based system for determining how many providers of various specialties to include on its panel. Healthchoice stopped accepting applications from physicians in those specialties that were already adequately represented on the provider panel. This need-based system is administered by the Healthchoice staff; providers do not participate in determining how many providers are needed on the Healthchoice panel. The Healthchoice staff also handles all inquiries regarding provider panel membership opportunities, without discussing those inquiries with the board of directors.

Healthchoice considers numerous factors in deciding how many providers to have on its panel, including: (1) the number of enrollees in the plan; (2) the geographic location of enrollees and providers; (3) the physicians' specialties; (4) the administrative costs of managing providers; (5) the special needs of particular payors; and (6) the availability of access to

existing members, i.e., how long a patient has to wait to get an appointment with a Healthchoice provider.  Although Healthchoice's general policy is to add new providers only when the need arises, if an existing Healthchoice provider adds a physician to his group practice, that new physician is automatically eligible to become a Healthchoice provider, subject to the new physician meeting Healthchoice's credentialling standards.  The purpose of the exception to the need-based system is to avoid the administrative difficulties associated with cross-coverage:  because physicians in a group practice cover for one another when they take time off, Healthchoice determined that it would be more cost effective to exercise its utilization review and quality control over the whole practice group.

Healthchoice asks its providers to refer Healthchoice patients to other Healthchoice providers whenever feasible.  If a provider continually refers Healthchoice patients to non-Healthchoice physicians without justification, Healthchoice may remove that provider from the panel.  This provision helps assure that Healthchoice and the payors can manage the costs of healthcare. Because non-Healthchoice physicians are not subject to Healthchoice's utilization review system, the payors have no effective means of determining whether the care rendered by a non-Healthchoice physician is necessary or cost efficient.

As of the date that discovery was complete in this case, Healthchoice had approximately 68,000 covered lives in the Orlando

area, which had a population of more than 1.1 million.[12]  There were approximately 865 Healthchoice physician providers among the more than 2,200 licensed physicians in the Orlando area.  At that time, Healthchoice competed with thirty-seven other PPOs, eleven Health Maintenance Organizations ("HMOs"), and numerous traditional insurance coverage companies.

  *b) The Merits of the Section 1 Claim Against Healthchoice and CFMA*

Dr. Levine alleges that Healthchoice, CFMA, and their member physicians have conspired to unreasonably restrain competition in violation of section 1 of the Sherman Act by maintaining a closed panel of providers physicians, by creating a financial disincentive for enrollees who want to use non-Healthchoice physicians, and by prohibiting Healthchoice physicians from referring Healthchoice enrollees to non-Healthchoice physicians.  Dr. Levine argues that these features restrict the availability of physician services to Healthchoice enrollees, lead to price stabilization in the market for physician services, and render excluded physicians incapable of competing for Healthchoice patients.  Dr. Levine primarily characterizes the activities of the defendants as a group boycott, or a concerted refusal to deal, however, he occasionally refers to the defendants' activities as illegal price fixing.  We will first discuss his contention that the defendants have illegally fixed prices, and then his contention that they have engaged in a concerted refusal to deal.

---

[12]"Covered lives" includes enrolled employees and any family members covered by their policy.  The parties define "the Orlando area" as Orange, Seminole, and Osceola counties.

### i) The Alleged Agreement to Fix Prices

Although Dr. Levine did not specifically argue to this Court that the defendants illegally fixed prices, i.e. provider fees, there are portions of his brief where he appears to assume the existence of such an agreement. That assumption is contrary to the uncontroverted evidence in the record, which establishes that there was no agreement between Healthchoice, CFMA, and their member physicians to fix provider fees. Healthchoice negotiates the provider reimbursement schedule directly with *payors,* not with providers. Healthchoice does not consult any physician providers when it compiles the CPT code unit values or the Master Payor Rate Schedule, and physician members of the Healthchoice board of directors are excluded from the reimbursement schedule proposal and approval process. Providers must either accept not more than the maximum reimbursement negotiated by Healthchoice with the payors and not charge the patient for any difference between their fee and the reimbursement, or else opt out of the plan. The result is that the providers' actual fees are not set. The only figure that is set is the maximum allowable fee that they will be reimbursed by Healthchoice. Nothing prevents the physician from dropping his fees even further in order to compete should he choose to do so.

This method of negotiating fees, in which the payors decide the maximum amount they are willing to reimburse providers for medical services and providers decide whether they are willing to accept that limitation on the reimbursement they receive, is a kind of "price fixing," but it is a kind that the antitrust laws do not prohibit. *See, e.g., Kartell v. Blue Shield,* 749 F.2d 922, 923-26

(1st Cir.1984) (Breyer, J.), *cert. denied,* 471 U.S. 1029, 105 S.Ct. 2040, 85 L.Ed.2d 322 (1985); *Pennsylvania Dental Ass'n v. Medical Serv. Ass'n,* 745 F.2d 248, 256-57 (3d Cir.1984), *cert. denied,* 471 U.S. 1016, 105 S.Ct. 2021, 85 L.Ed.2d 303 (1985); *Medical Arts Pharmacy v. Blue Cross & Blue Shield,* 675 F.2d 502, 504-06 (2d Cir.1982); *see also* 8 Phillip E. Areeda, *Antitrust Law* ¶ 1622b (1989). Because there is no genuine issue of material fact regarding the existence of an agreement among Healthchoice, CFMA, or its member doctors to fix provider fees, and because the defendants are entitled to judgment as a matter of law, Dr. Levine's section 1 claim against these defendants, to the extent that it alleges illegal price fixing, fails.

Our decision that Healthchoice's method of negotiating with payors the fees it pays providers does not violate the Sherman Act as a matter of law is supported by the Department of Justice and the Federal Trade Commission's recently issued "Statements of Enforcement Policy and Analytical Principles Relating to Health Care and Antitrust" ("DOJ Enforcement Policy" or "the policy"), *available in,* WESTLAW, 1994 WL 642477 (F.T.C.). The DOJ Enforcement Policy separates those multiprovider networks wherein competitors *agree with one another* regarding prices or market allocation, from those networks wherein such decisions are handled unilaterally by each competitor or through a third party "messenger." The policy defines the "messenger model" as involving "an agent or third party conveying to purchasers information obtained individually from providers in the network about prices the network participants are willing to accept, and conveying to

providers any contract offers made by purchasers." *Id.* at *38 (footnote omitted). The latter will "rarely present substantial antitrust concerns." *Id.* The policy states that "[t]he critical antitrust issue is whether the arrangement creates or facilitates agreements that restrict price or other significant terms of competition among the provider members of the network." *Id.* at *39. In this case, there is no evidence that the Healthchoice method of negotiating maximum fee reimbursement facilitates any *agreements among its provider panel members* to restrict price or any other forms of competition.[13]

### ii) The Alleged Concerted Refusal to Deal

Although there is no genuine issue of material fact regarding the existence of an agreement to *fix prices,* Dr. Levine submitted evidence sufficient to establish a genuine issue of material fact regarding the existence of a *concerted refusal to deal,* i.e. agreements among Healthchoice, CFMA, and their member providers to restrict the size of the provider panel, and to discourage

---

[13]We also note that in *Arizona v. Maricopa County Medical Soc'y,* the Supreme Court implicitly sanctioned this approach to negotiating reimbursement rates:

> [A] binding assurance of complete insurance coverage—as well as most of the respondents' potential for lower insurance premiums—can be obtained only if the insurer and the doctor agree in advance on the maximum fee that the doctor will accept as full payment for a particular service. Even if a fee schedule is therefore desirable, it is not necessary that the doctors do the price fixing.... [I]nsurers are capable not only of fixing maximum reimbursable prices but also of obtaining binding agreements with providers guaranteeing the insured full reimbursement of a participating provider's fee.

457 U.S. 332, 352-53, 102 S.Ct. 2466, 2477-78, 73 L.Ed.2d 48 (1982) (footnote omitted).

providers from referring Healthchoice enrollees to non-Healthchoice physicians. Thus, for purposes of defeating summary judgment against him, Dr. Levine has established the first element of his section 1 claim to the extent that it alleges a concerted refusal to deal. The question remains whether the agreements in question are an unreasonable restraint on competition as required to establish the second element of a section 1 claim.

Before we can determine whether the Healthchoice and CFMA agreements are an unreasonable restraint on competition, we must first decide whether to analyze them under the per se rule or the rule of reason. "[A] restraint may be adjudged unreasonable either because it fits within a class of restraints that has been held to be "per se' unreasonable, or because it violates what has come to be known as the "Rule of Reason.' " *F.T.C. v. Indiana Fed'n of Dentists,* 476 U.S. 447, 457-58, 106 S.Ct. 2009, 2017, 90 L.Ed.2d 445 (1986). "The presumption in cases brought under section 1 of the Sherman Act is that the rule-of-reason standard applies." *Seagood Trading Corp. v. Jerrico, Inc.,* 924 F.2d 1555, 1567 (11th Cir.1991). We apply the per se rule "only when history and analysis have shown that in sufficiently similar circumstances the rule of reason unequivocally results in a finding of liability," *Consultants & Designers, Inc. v. Butler Serv. Group, Inc.,* 720 F.2d 1553, 1562 (11th Cir.1983), i.e., when the conduct involved "always or almost always tend[s] to restrict competition and decrease output." *Broadcast Music, Inc.,* 441 U.S. at 19-20, 99 S.Ct. at 1562. We will not apply the per se rule "to restraints of trade that are of ambiguous effect." *Consultants & Designers,* 720 F.2d

at 1562; *see also Indiana Fed'n of Dentists,* 476 U.S. at 458-59, 106 S.Ct. at 2018 (declining "to extend per se analysis to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious"); *National Soc'y of Professional Eng'rs v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978).

Dr. Levine characterizes the agreement to limit the size of the provider panel and to discourage provider members from referring Healthchoice patients to non-Healthchoice physicians as a group boycott and urges this Court to apply the per se rule. But this Court has stated that "[t]he attachment of the group boycott label does not necessarily require as a consequence an application of the per se approach." *Consultants & Designers,* 720 F.2d at 1561 (citation and quotation marks omitted) (alteration in original). "The labeling of a restraint as a group boycott does not eliminate the necessity of determining whether it is a "naked restraint of trade with no purpose except stifling competition.' " *Id.* (quoting *White Motor Co. v. United States,* 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963)). In *F.T.C. v. Indiana Federation of Dentists,* the Supreme Court described the kind of the boycotts subject to the per se rule:

> Although this Court has in the past stated that group boycotts are unlawful per se, we decline to resolve this case by forcing the [defendant's] policy into the "boycott" pigeonhole and invoking the per se rule. As we observed last Term in *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985), the category of restraints classed as group boycotts is not to be expanded indiscriminately, and *the per se approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor....*

476 U.S. at 458, 106 S.Ct. at 2018 (emphasis added) (citation omitted).

Dr. Levine bases his concerted refusal to deal claim on Healthchoice's denial of his repeated attempts to apply for membership, and its rule discouraging panel members from referring patients to physicians outside the network. This case does not involve the kind of group boycott that warrants application of the per se rule, i.e., it is not a "naked restraint of trade with no purpose except stifling competition." *Consultants & Designers,* 720 F.2d at 1562. We will analyze the facts of this case under the rule of reason, instead of the per se approach, for two reasons. First, we are persuaded that because Dr. Levine has not proven that Healthchoice and CFMA have market power,[14] the Supreme Court's decision in *Indiana Federation of Dentists,* a pertinent part of which is quoted above, precludes us from applying the per se rule to these facts.

Second, the DOJ Enforcement Policy supports our decision to apply the rule of reason instead of the per se rule. The policy states that "[b]ecause multiprovider networks are relatively new to the health care industry, the Agencies do not yet have sufficient experience evaluating them to issue a formal statement of antitrust enforcement policy." DOJ Enforcement Policy, *available in,* WESTLAW, 1994 WL 642477, at 37 (F.T.C.). As previously noted, this Court is loath to condemn a practice as per se violative of the antitrust laws unless experience has shown that it always leads to anticompetitive effects in the market, *Consultants & Designers,* 720

---

[14]For a discussion of market power, see *infra* pp. 776-78.

F.2d at 1562, and the DOJ policy statement evidences that such experience is lacking with respect to multiprovider networks.

The DOJ Enforcement Policy also provides guidance on how to analyze the multiprovider network practice of excluding particular providers:

> Most multiprovider networks will contract with some, but not all, providers in an area. Such selective contracting may be a method through which networks limit their provider panels in an effort to achieve quality and cost containment goals and enhance their ability to compete against other networks. One reason often advanced for selective contracting is to ensure that the network can direct a sufficient patient volume to its providers to justify price concessions or adherence to strict quality controls by the providers. Where a geographic market can support several multiprovider networks, there are not likely to be significant competitive problems associated with the exclusion of particular providers by particular networks.

> A rule of reason analysis usually is applied in judging the legality of excluding providers from a multiprovider network. The focus of the analysis is not on whether a particular provider has been harmed by the exclusion, but rather whether the exclusion reduces competition among providers in the market and thereby harms consumers. Therefore, exclusion may present competitive concerns if providers are unable to compete effectively without access to the network, and competition is thereby harmed. The Agencies also recognize, however, that there may be procompetitive reasons associated with the exclusion, such as the provider's competence or ability and willingness to meet the network's cost-containment goals. In addition, in certain circumstances network membership restrictions may be procompetitive by giving non-member providers the incentive to form other networks in order to compete more effectively with the network.

DOJ Enforcement Policy at 42. We find no fault with that analysis, and consistent with it we conclude that the rule of reason applies to Dr. Levine's section 1 claim against Healthchoice and CFMA.

Under the rule of reason, the "test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Chicago Bd. of Trade v. United*

*States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918). Rule of reason analysis requires the plaintiff to prove (1) an anticompetitive effect of the defendant's conduct on the relevant market, and (2) that the conduct has no procompetitive benefit or justification. *E.g., Consultants & Designers,* 720 F.2d at 1562.

In order to prove an anticompetitive effect on the market, the plaintiff may either prove that the defendants' behavior had an "actual detrimental effect" on competition, or that the behavior had "the potential for genuine adverse effects on competition." In order to prove the latter, the plaintiff must define the relevant market and establish that the defendants possessed power in that market. *Indiana Fed'n of Dentists,* 476 U.S. at 460-61, 106 S.Ct. at 2019; *Capital Imaging Assoc., P.C. v. Mohawk Valley Medical Assoc., Inc.,* 996 F.2d 537, 546 (2d Cir.) ("[W]here the plaintiff is unable to demonstrate ... actual effects, it must at least establish that defendants possess the requisite market power so that their arrangement has the potential for genuine adverse effects on competition." (citation and quotation marks omitted)), *cert. denied,* --- U.S. ----, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993). We analyze the concerted refusal to deal in this case first for actual detrimental effect on competition, and then for potential adverse effect.

Dr. Levine contends that he has shown actual detrimental effects, i.e., that the defendants intended to, and did, restrict competition. But Dr. Levine has failed to support with any evidence his conclusory assertion that the defendants' behavior actually had the effect of restricting competition. Indeed, the

evidence in the record suggests the contrary. Although Healthchoice and CFMA denied him membership, Dr. Levine had no trouble establishing a booming practice. Dr. Levine opened a solo practice in 1989 with one patient, and in a little more than a year his practice was so busy that he began advertising to hire another physician. Dr. Levine acknowledges his extraordinary success—which earned him more than half a million dollars in his first full year of practice and nearly three quarters of a million dollars his second year—but he argues that had he been allowed to join Healthchoice, he would have been able to "score a touchdown." The antitrust laws are intended to protect competition, not competitors, *see Brown Shoe Co. v. United States,* 370 U.S. 294, 344, 82 S.Ct. 1502, 1534, 8 L.Ed.2d 510 (1962); *Todorov,* 921 F.2d at 1450, and we will not depart from that purpose in order to improve Dr. Levine's income standings in the physician league or help him win the Super Bowl of remuneration.

Dr. Levine also contends that he has shown actual detrimental effects on competition by showing that Healthchoice's closed panel resulted in fees rising and stabilizing, but there is no evidence of that in the record. Dr. Levine relies upon the Healthchoice Master Payor Rate Schedules from several years as evidence of rising fees, but those schedules do not establish that provider fees have risen. The Master Payor Rate Schedules include only one of the two factors that goes into calculating a fee—the conversion factor.[15] They do not include the other critical factor, which is

---

[15]For an explanation of how the fees are calculated, see *supra* pp. 769-70.

the unit values for the more than 9,000 CPT codes.  Without the unit values for the years covered by the Master Payor Rate Schedules, which Dr. Levine has not provided, the actual fees cannot be calculated.  Moreover, evidence in the record indicates that Healthchoice has on many occasions *lowered* both the conversion factors and the unit values when its analysis of the market indicated the need for a more competitive fee structure.  In any event, evidence of rising fees is insufficient unless placed in context with evidence about the fees charged by non-Healthchoice physicians, the resource costs underlying the physician services, and the rate of inflation.  Thus, Dr. Levine has failed to establish a genuine issue of material fact about whether Healthchoice and CFMA have had an actual detrimental effect on competition.

In the face of his failure to show an actual detrimental effect on competition, Dr. Levine argues that he still need not prove market power if he shows that the defendants intended to restrict competition.  The rule of reason analysis is concerned with the actual or likely effects of defendants' behavior, not with the intent behind that behavior.  *See U.S. Healthcare, Inc. v. Healthsource, Inc.,* 986 F.2d 589, 596 (1st Cir.1993) (stating that "effects are ... the central concern of the antitrust laws," and that motivation is but "a clue").  Thus even if Dr. Levine had established that the defendants intended to restrict competition—which he has not—proof of such intent would not relieve him of the necessity of either proving the defendants' market power or proving an actual detrimental effect on competition, and we have

already decided that he has failed to create a genuine issue of material fact as to actual detrimental effect.

In view of that, Dr. Levine's claim may only succeed under our section 1 rule of reason analysis if he proves that the defendants' acts had "the potential for genuine adverse effects on competition."  To do this, Dr. Levine must define the relevant product and geographic markets and prove that the defendants had sufficient market power to affect competition.  *See Indiana Fed'n of Dentists,* 476 U.S. at 460-61, 106 S.Ct. at 2019.  Dr. Levine contends that the relevant product market should be the provision of internist services to Healthchoice patients, which he characterizes as an "aftermarket," relying on *Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), and that the relevant geographic market is the Orlando area.  He argues that the product market he has defined is separate from the market for all other physician services in the Orlando area.  We disagree.

"To define a market is to identify producers that provide customers of a defendant firm (or firms) with alternative sources for the defendant's product or services."  2A Phillip E. Areeda et al., *Antitrust Law* ¶ 530a, at 150 (1995) (footnote omitted);  *see also Eastman Kodak,* 504 U.S. at 481, 112 S.Ct. at 2090.  The "market is composed of products that have reasonable interchangeability."  *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 404, 76 S.Ct. 994, 1012, 100 L.Ed. 1264 (1956);  *see also United States Anchor Mfg., Inc. v. Rule Indus., Inc.,* 7 F.3d 986, 995 (11th Cir.1993), *cert. denied,* --- U.S. ----, 114

S.Ct. 2710, 129 L.Ed.2d 837 (1994). Therefore, in order to provide an accurate market definition in this case, Dr. Levine must identify the physician services that Healthchoice enrollees would deem to be reasonably interchangeable with the services provided by Healthchoice providers. It is undisputed that Healthchoice enrollees are free to choose non-Healthchoice physicians, and that Healthchoice payors will cover at least some portion of the non-Healthchoice physician's fee. Dr. Levine contends, however, that it is financially impractical for Healthchoice enrollees to visit non-Healthchoice physicians because the enrollees have to pay more money out of their own pockets to do so. Thus, he argues, non-Healthchoice internists are not interchangeable with Healthchoice internists, which means Healthchoice internists are a separate product market. We are not persuaded.

Dr. Levine has failed to present evidence showing how much more, if any, Healthchoice enrollees must pay to visit a non-Healthchoice physician. In fact, Dr. Levine admits that he has treated two Healthchoice enrollees in his practice, and that for one of those patients he waived the payor's copayment requirement so that the patient did not have an additional out-of-pocket expense.[16] Moreover, Dr. Levine has offered no evidence to show that the cost to the enrollee of switching to another healthcare plan would be prohibitively expensive. Although Dr. Levine's expert assumed that Healthchoice enrollees are locked in to the

---

[16]Dr. Levine says that this patient stopped seeing him because she felt too guilty about his having waived the copayment requirement. That purported reason is somewhat ironic in view of Dr. Levine's income level. *See supra* p. 776.

Healthchoice plan, he admitted that he had seen no evidence that the enrollees' choice of plan had been so restricted. To the contrary, the evidence in the record establishes that the largest Healthchoice payor offers its enrollees several choices for healthcare coverage, and that those enrollees are allowed to switch plans. There is nothing to indicate that the other Healthchoice payors offer their enrollees any less choice. Thus, we hold that Dr. Levine's narrow definition of the relevant product market does not satisfy his burden of presenting prima facie evidence of the relevant market.[17] *See L.A. Draper & Son v. Wheelabrator-Frye, Inc.,* 735 F.2d 414, 422 (11th Cir.1984) ("An antitrust plaintiff ... makes out a prima facie case under the rule of reason only upon proof of a well-defined relevant market upon which the challenged anticompetitive actions would have substantial impact." (citation and quotation marks omitted)); *see also Bathke v. Casey's Gen. Stores, Inc.,* 64 F.3d 340, 345 (8th Cir.1995); *Pastore v. Bell Tel. Co.,* 24 F.3d 508, 512 (3d Cir.1994).

Even if Dr. Levine had adequately defined the relevant market, he has presented no evidence to prove the defendants' market power. Absent evidence that the defendants had sufficient market power to affect competition, Dr. Levine's section 1 claim must fail. Therefore, because Dr. Levine has not established either that the defendants' behavior had an "actual detrimental effect" on competition or "the potential for genuine adverse effects on

_____

[17]Dr. Levine was required to define both the relevant product market and the relevant geographic market; however, because we have held that he failed to adequately define the relevant product market, we need not reach whether the Orlando area is a proper relevant geographic market.

competition," *Indiana Fed'n of Dentists,* 476 U.S. at 460-61, 106 S.Ct. at 2019, we hold that the district court properly dismissed Dr. Levine's section 1 claim against Healthchoice and CFMA.[18]

## 2. The Section 1 Claim Against ORHS and Sand Lake Hospital

Dr. Levine claims that ORHS, Sand Lake Hospital, and other unnamed co-conspirators on the Sand Lake Hospital medical staff violated section 1 of the Sherman Act by conspiring to suspend his staff privileges without good cause, and that this activity constituted a concerted refusal to deal resulting in an unreasonable restraint of trade. As Dr. Levine conceded at oral argument, the per se rule does not apply to the defendants' decision to suspend his staff privileges. As with Dr. Levine's section 1 claim against Healthchoice and CFMA, we will apply the rule of reason to his section 1 claim against ORHS and Sand Lake Hospital.

We need not decide whether Dr. Levine has offered sufficient proof of a conspiracy to restrain trade between ORHS, Sand Lake Hospital, and members of its medical staff, the first element of a section 1 claim, because once again Dr. Levine has failed to demonstrate that any resulting restraint on competition is unreasonable, the second element of a section 1 claim. More particularly, Dr. Levine has not met the rule of reason's requirement of proving an actual or potential detrimental effect on competition.

---

[18]Because we hold that Dr. Levine has failed to establish any anticompetitive effect, we need not reach the second part of the rule of reason analysis and decide whether the defendants' conduct may be excused by some procompetitive benefit or justification.

The only evidence Dr. Levine offers to show that his suspension had an actual detrimental effect on competition is that one of his patients came to the Sand Lake Hospital ER during his suspension and was unable to use Dr. Levine's services. The practical effect of this incident is no different than if Dr. Levine's patient had been taken to the ER at a hospital where he had never even applied for staff privileges—the patient would be unable to see Dr. Levine at that location at that particular time. However, had the patient gone or been taken to Florida Hospital (which has five locations), where Dr. Levine did have staff privileges, she would have been able to use Dr. Levine's services. We are convinced that a patient's inability to see Dr. Levine in the Sand Lake Hospital ER when she asked for him does not rise to the level of an actual detrimental effect on competition. *Cf. Lie v. St. Joseph Hosp.,* 964 F.2d 567, 569-70 (6th Cir.1992) (holding that plaintiff doctor's proof that hospital staff suspension resulted in him having a lower income did not rise to level of actual detrimental effects on competition); *Tarabishi v. McAlester Regional Hosp.,* 951 F.2d 1558, 1569 n. 15 (10th Cir.1991) (holding that plaintiff's staff privileges suspension was not an actual detrimental effect on competition because it did not result in restriction of choice to consumers or in a reduction of competition), *cert. denied,* 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992). Thus Dr. Levine's only remaining recourse for establishing his section 1 claim is to demonstrate the potential for detrimental effects on competition, and to do that he must establish that the defendants had sufficient market power to affect

competition. *Indiana Fed'n of Dentists,* 476 U.S. at 460-61, 106 S.Ct. at 2019.

Dr. Levine maintains, however, that he need not prove the defendants' market power, and for that proposition he relies on *Summit Health, Ltd. v. Pinhas,* 500 U.S. 322, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991), *Boczar v. Manatee Hosp. & Health Sys., Inc.,* 993 F.2d 1514 (11th Cir.), *reh'g denied,* 11 F.3d 169 (11th Cir.1993), and *Bolt v. Halifax Hosp. Medical Ctr.,* 891 F.2d 810 (11th Cir.), *cert. denied,* 495 U.S. 924, 110 S.Ct. 1960, 109 L.Ed.2d 322 (1990). None of those decisions supports Dr. Levine's position.

The sole issue to be decided in *Pinhas* was whether a hospital's exclusion of a physician from its medical staff could satisfy the "effect on interstate commerce" jurisdictional requirement. 500 U.S. at 324, 111 S.Ct. at 1844. Dr. Levine quotes the following language from Justice Scalia's dissent in *Pinhas* to support his argument: "Since group boycotts are *per se* violations ... [the plaintiff] need not prove an effect on competition in the Los Angeles area to prevail...." *Id.* at 337, 111 S.Ct. at 1851. However, this is no more than a restatement of the basic analysis under the per se rule. Because Dr. Levine has already conceded that the per se rule does not apply to his claim against the hospital, the language from Justice Scalia's dissent does not help him. Moreover, Dr. Levine ignores Justice Scalia's final position in his dissent, which is that the Sherman Act should not even apply to the hospital's actions because the hospital suspension did not effect interstate commerce. *Id.* at 341-43, 111

S.Ct. at 1853-54.

Dr. Levine's reliance on *Bolt* is no more persuasive. He interprets *Bolt* to stand for the proposition that, in his words, "there was no requirement to prove [market definition or market share] when there is evidence of anticompetitive intent." Dr. Levine's interpretation of *Bolt* misses the point that our focus in that opinion was only on the first element of the section 1 claim—whether there was sufficient evidence of a contract, combination, or conspiracy to submit to the jury. 891 F.2d at 818, 829. We held that as to some of the defendants, there was sufficient evidence of a conspiracy to go to the jury, and thus remanded the case to the district court. All discussion of intent in *Bolt* was in the context of its value as circumstantial evidence of the existence of an agreement. *Id.* at 819-20. As to the second element of the section 1 claim in *Bolt,* we explained that the district court had granted a motion for directed verdict "before [the plaintiff] reached that part of his case involving restraint on competition." *Id.* at 829. We criticized the district court's premature ruling and stated that "[t]he better course would have been to defer ruling on the motions for directed verdict until after [the plaintiff] had presented his entire section 1 case." *Id.* at 828. If anything, *Bolt* is inconsistent with Dr. Levine's position that he should be relieved of proving market power.

His reliance on *Boczar* is equally misplaced. In *Boczar,* we reviewed the district court's grant of a post-verdict motion for judgment as a matter of law in favor of the defendants based on its finding that there was insufficient evidence of a conspiracy. We

reversed the district court and held that the plaintiff had presented sufficient evidence to support the jury's verdict. 993 F.2d at 1519. As to the anticompetitive effect element of the plaintiff's case, we simply observed—without discussing the evidence that had been presented at trial—that the defendants' actions had "effectively ended [the plaintiff's] ability to compete and to practice ... and burdened her ability to compete generally." *Id.* That was nothing more than a fact-specific observation that the plaintiff in *Boczar* had proven anticompetitive effect. By contrast, the record in this case establishes beyond legitimate dispute that Dr. Levine's ability to compete and practice have flourished. Nothing in *Boczar* supports his position that he need not prove the defendants' market power.

In order to prevail in a rule of reason case, absent a demonstrated adverse effect on competition, a plaintiff must define the market and prove that the defendants had sufficient market power to adversely affect competition. *See Indiana Fed'n of Dentists,* 476 U.S. at 460-61, 106 S.Ct. at 2019. Because he has offered no evidence defining the relevant product or geographic market, and because he has not established ORHS's or Sand Lake Hospital's market power, the district court properly granted summary judgment to the defendant on this section 1 claim.

B. THE SECTION 2 CLAIMS

In Count 2 of his complaint Dr. Levine claimed that CFMA monopolized, attempted to monopolize, and conspired with Healthchoice, ORHS, and Sand Lake Hospital to monopolize the market for physician medical services to Healthchoice enrollees in the

Orlando area in violation of section 2 of the Sherman Act.[19]  "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570-571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966); *see also T. Harris Young & Assocs., Inc. v. Marquette Elec., Inc.,* 931 F.2d 816, 823 (11th Cir.), *cert. denied,* 502 U.S. 1013, 112 S.Ct. 658, 116 L.Ed.2d 749 (1991); *Austin v. Blue Cross & Blue Shield,* 903 F.2d 1385, 1391 (11th Cir.1990).  "Monopoly power under § 2 requires, of course, something greater than market power under § 1." *Eastman Kodak,* 504 U.S. at 480, 112 S.Ct. at 2090.

To establish a violation of section 2 for attempted monopolization, "a plaintiff must show (1) an intent to bring about a monopoly and (2) a dangerous probability of success." *Norton Tire Co. v. Tire Kingdom Co.,* 858 F.2d 1533, 1535 (11th Cir.1988).

> To have a dangerous probability of successfully monopolizing a market the defendant must be close to achieving monopoly power.  Monopoly power is "the power to raise prices to supra-competitive levels or ... the power to exclude competition in the relevant market either by restricting entry of new competitors or by driving existing competitors out of the market."

*United States Anchor Mfg.,* 7 F.3d at 994 (quoting *American Key*

---

[19]Section 2 provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony."  15 U.S.C.A. § 2 (West 1973).

*Corp. v. Cole Nat'l Corp.,* 762 F.2d 1569, 1581 (11th Cir.1985)). A claim for conspiracy to monopolize, on the other hand, does not require a showing of monopoly power. Instead, a plaintiff proves a section 2 conspiracy to monopolize by showing: "(1) concerted action deliberately entered into with the specific intent of achieving a monopoly; and (2) the commission of at least one overt act in furtherance of the conspiracy." *Todorov,* 921 F.2d at 1460 n. 35.

Although Dr. Levine's complaint is somewhat ambiguous, it appears that he is alleging all three types of claims—monopolization, attempted monopolization, and conspiracy to monopolize—only against CFMA. Healthchoice, ORHS, and Sand Lake Hospital are each alleged only to have conspired to monopolize the relevant market. Even assuming that Dr. Levine is alleging that all four defendants are liable for all three section 2 claims, the defendants are entitled to summary judgment as a matter of law.

Proof of monopoly power in the relevant market is the first element of a monopolization claim, and proof that there is a dangerous probability of the defendant successfully attaining monopoly power is the second element of an attempted monopolization claim. Dr. Levine's failure to adequately define the relevant market, and his failure to prove that the defendants possessed or were close to possessing monopoly power in that relevant market, are fatal to his section 2 claims for monopolization and for attempted monopolization. Moreover, as to his claim for conspiracy to monopolize, Dr. Levine has presented no evidence that the defendants possessed a specific intent to monopolize, which is the

first element of a conspiracy to monopolize claim, when they denied him membership or when they suspended his staff privileges. Because Dr. Levine has failed to establish a genuine issue of material fact as to necessary elements of these section 2 claims, we affirm the district court's grant of summary judgment in favor of the defendants as to these claims.[20]

## IV. CONCLUSION

The district court's grant of summary judgment in favor of the defendants is AFFIRMED.

---

[20]We also reject Dr. Levine's argument that the district court erroneously granted summary judgment against him on his state law antitrust claims. Florida's statute regulating combinations in restraint of trade provides: "It is the intent of the Legislature that, in construing this chapter, due consideration and great weight be given to the interpretations of the federal courts relating to comparable federal antitrust statutes." Fla.Stat.Ann. § 542.32 (West 1988); *see also All Care Nursing Serv., Inc. v. Bethesda Memorial Hosp., Inc.,* 887 F.2d 1535, 1539 n. 1 (11th Cir.1989) (Tjoflat, J. concurring); *Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.,* 849 F.2d 1336, 1340 (11th Cir.1987) ("In applying this provision, the Florida courts held that the Florida legislature has, in effect, adopted as the law of Florida the body of anti-trust law developed by the federal courts under the Sherman Act. *St. Petersburg Yacht Charters, Inc. v. Morgan Yacht, Inc.,* 457 So.2d 1028 (Fla.App.1984). Thus, in analyzing this case, we may, and indeed must, apply the federal precedent developed under Section 2 of the Sherman Act."). Therefore, the district court's grant of summary judgment on the state law antitrust claims was proper for the same reasons its grant of summary judgment on the federal antitrust claims was proper.