Anthony D. VIAZIS, et al., Plaintiffs,

v.

AMERICAN ASSOCIATION
OF ORTHODONTISTS,
et al., Defendants

No. 4:98CV245.

United States District Court,
E.D. Texas,
Sherman Division.

Sept. 24, 2001.

Braden W. Sparks, Dallas, TX, for Plaintiffs.

David P. Blanke, Vinson & Elkins LLP, Austin TX, Margaret M. Zwisler, Diane E. Bieri, Howrey Simon Arnold & White

LLP, Washington, DC, Curtis L. Marsh, Marsh & Forrester LLP, Dallas, TX, for Defendants.

William B. Nash, Jackson Walker LLP, San Antonio, TX, Noah Henry Simpson, Simpson Woolley McConachie, Dallas, TX, for Movants.

## MEMORANDUM OPINION AND ORDER

PAUL N. BROWN, District Judge.

Defendants in this case moved at trial for Judgment as a Matter of Law as to Plaintiff Anthony D. Viazis' ("Viazis") sole remaining claim in this case, Viazis responded, and the Court ruled orally in Defendants' favor on November 13, 2000, and stated that this more detailed written order would be entered at a later date.

### I. INTRODUCTION.

The pleadings and evidence at trial establish the following. In 1991, Viazis, a practicing orthodontist in the State of Texas, invented and patented triangular orthodontic brackets. Viazis claims that, when used in conjunction with super-elastic wires, the brackets can straighten teeth more quickly and less expensively than conventional braces. In 1992, GAC International, Inc. ("GAC"), an international marketer and distributor of orthodontic products, contracted with Viazis to market and distribute the Viazis brackets under an exclusive license. Viazis also contracted to make personal appearances and educate other practitioners about the brackets.

In April of 1996, Viazis sent out an advertising mailer to parents in the Plano, Texas area and announced a free seminar at a local school. The advertisement claimed that the brackets were " 'faster,' less expensive and potentially safer." (Pls.' Resp. Opp. AAO SWSO's Mot.

Summ. J. at 6.) Viazis held the seminar trumpeting his brackets in early May.

A member of both the Greater Dallas Association of Orthodontists (the "GDAO") and the American Association of Orthodontists ("AAO"), a current defendant in this action, forwarded the advertising materials to the AAO, informing the association of a potential breach of the AAO's Code of Professional Responsibility in that the advertising might constitute deceptive or misleading communications or public statements. The code of the AAO prohibits unjustifiable suggestions that one dental device is superior to others. In addition, the rule prevents dental professionals from creating unjustified expectations about results of treatment.

Viazis alleged that his relationship with GAC, which was, as indicated *supra*, his initial manufacturer, marketer, and distributor, was destroyed by reaction to his advertising efforts. Viazis alleged that a number of local practitioners who attended Viazis' seminar threatened never to purchase from GAC again (Joint Final Pre–Trial Order at 5.) In fact, Viazis presented a May 8, 1996 letter Leo Dohn ("Dohn"), chairman of GAC at the relevant time and also a Defendant here, wrote to Viazis where Dohn expressly stated threats had been made against GAC. It is indisputable that after early May 1996, the commercial relationship between Viazis and GAC deteriorated. Viazis and GAC's disagreements were ostensibly addressed by way of a compromise agreement entered into in mid–1997. Viazis alleged at trial, however, that he did not voluntarily enter such mid–1997 agreement.

Actually, the revised arrangements between GAC and Viazis did not resolve the controversies surrounding his braces. In December of 1997, the AAO advised Viazis that disciplinary action was warranted against him for the comments that he made in his advertisements regarding less treatment time, more patient comfort, no clinical root resorption, and faster, easier braces. Then, on August 28, 1998, Viazis and other Plaintiffs commenced the instant action against the AAO, the Southwestern Society of Orthodontists ("SWSO"), the Greater Dallas Association of Orthodontists ("GDAO"), and various individuals no longer Defendants including Dr. Mark Geller ("Geller"), Dr. Douglas Crosby ("Crosby"), Dr. Dean Jensen ("Jensen"), Dr. Richard McFarland ("McFarland"), and Dr. T.L. Daugherty ("Daugherty") (collectively, the "Former Individual Defendants"), alleging violations of antitrust law as well as state and common law. Viazis subsequently added as Defendants Dohn and GAC. By trial, however, Viazis had only one claim remaining against the following Defendants: the AAO, the SWSO, GAC, and Dohn. (Joint Final Pre–Trial Order at 2–3.) Specifically, Viazis claims that the remaining Defendants' conduct violated Section 1 of the Sherman Act.

Through the course of the case, Viazis maintained various allegations crucial to his remaining claim. First, he has alleged: "[The AAO] ... was ... attempting to control the entry of all new orthodontic products in the industry [when it disciplined Viazis]." (Joint Final Pre–Trial Order at 3.) Second, Viazis asserted the Defendants undertook to enforce an unwritten rule prohibiting direct advertising to the public. (*See id.*) Actually, due to the requirements of Section 1 explained *infra*, it is important to concretely fix Viazis' view of the relationship between Defendants and other orthodontists. In this regard, Viazis' counsel expressly stated early on at trial that Viazis alleged *one conspiracy* among the four remaining Defendants. (Trial Transcript at 88.) He essentially stated the same thing later in the trial:

> The Court: Mr. Sparks, I want to be sure that I understand what your claim

is in this case. Your contentions in the pretrial order are not artfully drawn. They are difficult to decipher.

I have interpreted them to mean that you are claiming one conspiracy composed of the AAO, the [SWSO], [Dohn], GAC, and other orthodontists, correct.

[Viazis' Counsel]: Correct.

The Court: Now, one conspiracy, correct?

[Viazis' Counsel]: Correct.

(Trial Transcript at 1059.) Finally, after resting his case, Viazis' counsel stated: "The purpose of the conspiracy was ... to punish Viazis [for doing comparative advertising] by restraining his bracket from the marketplace." (Trial Transcript at 1168.)

Before and at the conclusion of Viazis' case, the Defendants asserted motions for judgment as a matter of law. In a joint motion asserted before Viazis rested, the Defendants moved on the basis that Viazis had failed to show one of the requisite Section 1 elements. Additionally, at the close of Viazis' case, the Defendants filed separate motions for judgment as a matter of law claiming that Viazis had failed to submit sufficient evidence to make out any of the three required Section 1 elements.

## II. STANDARD.

Under Fed.R.Civ.Proc. 50(a)(1), "[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient basis for a reasonable jury to find for that party on an issue," then a court may "determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue." Further, "mo-

tions for judgment as a matter of law may be made at any time before submission of the case to the jury," and are to "specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment." Fed.R.Civ.Proc. 50(a)(2).[1]

 In order to create a jury question on an issue, "there must be a dispute in the substantial evidence, that is, evidence which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Chaney v. New Orleans Pub. Facility Management,* 179 F.3d 164, 167 (5th Cir.1999). "[A] mere scintilla of evidence is insufficient to present a question for the jury" and even if the "evidence is more than a scintilla ... some evidence may exist to support a position which is yet so overwhelmed by contrary proof as to yield a directed verdict." *Id.* (citations omitted). In evaluating Defendants' motions for judgment as a matter of law, this Court must "view the ... record in the light most favorable to [a plaintiff], drawing all factual inferences in favor of ... [a plaintiff], and leaving credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts to the jury." *Conkling v. Turner,* 18 F.3d 1285 (5th Cir. 1994), *appeal after remand,* 138 F.3d 577 (1998) (citations omitted).

## III. ANALYSIS.

 Sherman Act Section 1 prescribes "[e]very contract, combination ..., or conspiracy, in restraint of trade." It does not, however, prohibit every conceivable restraint of trade. Rather, it forbids those that result from concerted action. *Ginzburg v. Memorial Healthcare Sys.,*

---

**1.** The Court recites Fed.R.Civ.P. 50 as it read before December 1, 2000 when amendments to the Federal Rules of Civil Procedure took effect. The pre-December 2000 version of the rules governs this case.

*Inc.,* 993 F.Supp. 998, 1009 (S.D.Tex.1997) (citations omitted). Additionally, such concerted restraints of trade must be judged unreasonable. *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.,* 472 U.S. 284, 105 S.Ct. 2613, 2616, 86 L.Ed.2d 202 (1985) (citation omitted). Finally, even if a plaintiff proves an unreasonable concerted restraint of trade, to recover under the antitrust laws, he must show "cognizable injury attributable to the violation." *Taylor Publishing Co. v. Jostens, Inc.,* 36 F.Supp.2d 360, 372 (E.D.Tex.1999) (citation omitted).

## A. Concerted Action

■ Antitrust jurisprudence provides various doctrines relevant to Viazis' charges of conspiracy here. As an important statement of relevant general principle, the Court notes that " 'antitrust limits the range of permissible inferences from ambiguous evidence.' " *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Discount Centers, Inc.,* 200 F.3d 307, 312 (5th Cir. 2000) (citing *Matsushita Elec. Indus. v. Zenith Radio,* 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). Indeed, " 'conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy[.]' " *Id.* at 313 (citing *Matsushita Elec. Indus.,* 106 S.Ct. at 1356).

■ More specifically relevant here, while "[a] conspiracy may be shown by circumstantial evidence," the "evidence must tend to 'exclude the possibility' that the defendants acted independently." *Culberson, Inc. v. Interstate Elec. Co.,* 821 F.2d 1092, 1093 (5th Cir.1987) (referencing *Kreuzer v. American Academy of Periodontology,* 735 F.2d 1479, 1486 (D.C.Cir. 1984) and citing *Matsushita Elec. Indus.,* 106 S.Ct. at 1357). Inferences of concerted action from circumstantial evidence must be " 'reasonable in light of the competing inferences of independent action or collusive action that could not have harmed [a plaintiff].' " *Id.* (citing *Matsushita Elec. Indust.,* 106 S.Ct. at 1357).

■ Further, the law has had special occasion to consider permissible inferences in the context of manufacturer relationships with customers or distributors such as the relationships at issue here. In doing so, it has concluded that " '[t]o allow evidence of termination following or in response to complaints to serve as the sole basis for [finding a conspiracy] would tend to discourage legitimate dealer complaints and legitimate manufacturer action in the face of such complaints.' " *Id.* (citing *Business Elec. Corp. v. Sharp Elec. Corp.,* 780 F.2d 1212, 1217 (5th Cir.1986) and quoting *Monsanto v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984)). Or, as the Eighth Circuit has put it:

> [E]vidence that a manufacturer took adverse action against a dealer following, or in response to, . . . complaints from other dealers is not enough to support an inference of conspiracy. Instead, the [plaintiff] must present additional evidence tending to exclude the possibility that the manufacturer took the adverse action independently.

*Lovett v. Gen. Motors Corp.,* 998 F.2d 575, 578 (8th Cir.1993) (citing *Monsanto,* 104 S.Ct. at 1470–71 and *Matsushita Elect. Indus. Corp.,* 106 S.Ct. at 1356).

■ With respect especially to GAC and Dohn, the evidence presented in this case by Viazis simply could not satisfy these standards. All one can reasonably say Viazis really did was to offer a letter Dohn sent Viazis where Dohn stated that several major Dallas-area accounts had threatened GAC that they would no longer purchase brackets or other products from GAC because they associated Viazis' marketing methods with GAC. (*See* Pl.'s Ex.

75.) Shortly thereafter, GAC and Viazis modified their relationship so that GAC no longer marketed Viazis' brackets but only manufactured them for him. The evidence shows that prior to Viazis' controversial mailer and seminar, GAC had a practice of not advertising orthodontic materials to the end-users of braces—the public—directly. Rather, it advertised to medical professionals, who distributed the brackets to the end-users. GAC steadfastly adhered to this practice before, during, and after the Viazis mailer and seminar. In fact, GAC's evidence supports the notion that any "threats" or complaints of its distributors—orthodontists—only reinforced its view such advertising was inappropriate and bad business.

Viazis submitted various pieces of evidence and case law, which the Court found unpersuasive, to argue there was more to GAC's "dropping" him such that a jury should have addressed the concerted action issue. First, Viazis suggested he presented credible evidence that GAC dropped him as more than just a response to customer complaints, but under pressure from the AAO (and presumably the SWSO). (Trial Transcript at 1165–66). Specifically, he argued various inconsistencies:

> Well, first of all, you just heard Barry Mervine [,GAC's regional sales manager,] deny that there was ever any indication that any orthodontist had ever threatened GAC. You have every orthodontist who has testified denying that he ever made any threat. In other words, the Defendants have put this evidence in the record that there is absolutely no evidence, if you want to believe the orthodontists, and if you believe everybody at GAC except Mr. Dohn. Even Mr. Dohn, its pure hearsay and its third-

party hearsay. He heard it from Schultz [, President of GAC,] who heard it from Mervine, who says it didn't happen.

(Trial Transcript at 1166.) The Court's review of the evidence cited by Viazis showed Mr. Mervine denied or couldn't recall threats being made against GAC while Dohn sent a letter to Viazis claiming threats had been made. Also, it is true that Viazis presented evidence that Dohn heard about threats through Schultz and suggesting that Schultz heard about them through Mervine. None of this did anything more, however, than to create, in summary judgment parlance, a scintilla of evidence of some sort of collusion between GAC and someone else.

It did not create a scintilla of evidence that the SWSO or the AAO were the impetus behind any threats or that GAC acted in concert with either. In this regard, all Viazis showed was that one of the Individual Defendants was, at the relevant time, the president-elect of the SWSO, the regional affiliate of the national AAO. He claimed this orthodontist, Dr. Mark Geller, was one of those who threatened GAC, offered a letter Schultz mailed to Geller stating that GAC was not behind Viazis' advertising techniques (McFarland, and Daugherty received similar, if not identical, letters), see Trial Transcript at 1091, 1120, and submitted that Geller, along with Crosby, Jensen, Dr. John Wise, and Dr. Stephanie Smith attended Viazis' Plano seminar, see Trial Transcript at 951–52, 1016. Even if this evidence had been sufficient for the jury to conclude Geller and some of the other names Viazis offered were the "major [GAC] accounts" that Dohn cited in his letter as threatening to take their business from GAC,[2] which the

---

2. In fact, as examples, both Geller and Crosby denied at trial that they were significant customers (major accounts) for GAC, and Viazis did not offer evidence to disprove their denials.

Court does not believe a reasonable jury could, it is not sufficient to conclude the AAO or SWSO drove the threats and that GAC responded to the AAO or SWSO.

■ This is so because "a principal will be liable for an antitrust violation [based on the actions of its agents when they] act[ ] with apparent authority ... by conspiring with another person." *Alvord–Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1009 (3rd Cir.1994). Whether certain individuals did or did not complain they would remove their business could not have implicated the AAO or SWSO merely because those individuals were members of, or even, as in the case of Geller, an officer of such entities. An elementary and widely accepted principle of agency law is that apparent authority results when a principal does something to make third parties believe its agents have authority to act in a certain way. No reasonable reading of the evidence presented by Viazis can suggest GAC thought the complaints occurred under the auspices of AAO's or SWSO's apparent authority.

Not only did Viazis fail to show that GAC's alteration of its relation with him was coerced by the AAO or SWSO, he failed to sufficiently implicate concerted influence by anyone else. Indeed, even if a jury could have found Geller and some of the other names Viazis tossed out were the "major [GAC] accounts" that Dohn cited and that threats occurred, it would be wholly consistent, as a matter of law, with GAC legitimately responding to the complaints of several of its customers. This conclusion is obvious from an application of the statements of law in the customer complaint cases cited *supra*, and the facts from some of those cases reinforce it. In fact, *Lovett* presents facts readily analogous to those here where the Eighth Circuit granted judgment as a matter of law to the antitrust defendant—General Motors Corporation ("GM").

In the case, GM stood accused of, among other things, having violated Section 1 by reducing the flow of automobiles to one of its dealers in Minnesota, allegedly in concert with other complaining dealers. *Lovett*, 998 F.2d at 576–78. Underlying the dispute was GM's allocation of areas of primary responsibility ("APRs") to its dealers. *Id.* at 577. The aggrieved dealer engaged in a marketing program that sold cars to consumers at only $49 above the dealer's factory invoice. *Id.* The program apparently resulted in consumers from a different APR, including the "Twin Cities" region of the state flocking to the aggrieved dealer as a purchase, but not servicing, point for GM vehicles. *Id.* at 577–78. Predictably, GM dealers having APRs including the Twin Cities were not happy as "[d]ealer associations and individual dealers complained that [the plaintiff dealer's] program was detracting business from the Twin Cities area and reducing their profits ...." *Id.* at 577. "They asked GM to take strong action to eliminate [the plaintiff dealer's] program." *Id.*

The plaintiff dealer in *Lovett* presented what this Court believes to be significant and relatively unambiguous evidence that GM's ultimate reduction in vehicle flow to it was taken as a result of its dealers' complaints. First, GM scrutinized the plaintiff's car sales record. *Id.* at 579. Second, GM division officials visited the plaintiff and expressed concern that they could not meet its orders for GM cars. *Id.* One such official "got angry and expressed opposition to [the plaintiff's marketing] program." *Id.* Another informed the owner of the plaintiff dealer (himself a plaintiff) that "Twin Cities Cadillac dealers were very upset and [that the dealer] should stop its program." *Id.* Third, GM division officials informed their superiors in written memoranda that the Twin Cities dealers were upset because their profits were being hurt. *Id.* Fourth, one official

in the Twin Cities Buick Dealer Advertising Association informed a GM division officer, a Buick officer, that the official was resigning from the association in protest over Buick's reluctance to combat the plaintiff dealer's program. *Id.* Finally, the plaintiff submitted evidence that a Twin Cities dealer told a customer the customer would receive an automobile faster through the Twin Cities dealer because the Twin Cities dealers had "gotten together . . . [with] GM . . . to run [the plaintiff] out of business." *Id.* at 580. All of this occurred before Buick determined it "could not distribute cars [in response to the plaintiff dealer's program]." *Id.* at 579–80.

The plaintiff apparently even presented circumstantial evidence of GM collusion with dealers after the Buick decision to curtail the plaintiff dealer's program. For instance, another customer who complained to GM about delay in receiving an auto from the plaintiff reported being told by a GM employee: "[Y]ou know what is happening." *Id.* Despite this evidence on top of the other evidence cited *supra*, the Eight Circuit found the plaintiff's evidence was ambiguous and could not overcome competing inferences of legitimate behavior. *Id.* It is apparent to this Court then, that the evidence presented by Viazis to suggest GAC acted in concert with the AAO, SWSO or others is at a minimum no less ambiguous than that presented in *Lovett.*

One possible distinction between *Lovett* and this case, however, is that the Eight Circuit noted that GM had "steadfastly refused" to discuss the plaintiff dealer with complaining dealers. *Id.* Instead, the Eight Circuit felt GM took the complaints and engaged in internal deliberations about what to do. *Id.* Here, somewhat more direct evidence has been presented suggesting that GAC did discuss the complaints with some orthodontists. To begin,

there are the letters GAC apparently mailed to orthodontists distancing itself from Viazis' mailer. It is not clear whether these letters were mailed before GAC was "threatened," if, in fact, threats were made. Another item is Dohn's admission that he copied Dr. Earl Cote, a former president of the AAO, on the letter reciting threats (along with admonishment of Viazis). Dohn claimed that Cote was a friend of GAC's who had mentioned to Dohn, after the AAO's 1996 convention following the Viazis seminar, that he thought "it was bad policy for GAC to continue its association with Dr. Viazis." (*See* Trial Transcript at 232–233.) As a final example, Viazis presented evidence that Geller, Jensen, Dr. Carlos Navarro, and perhaps other orthodontists were pulled to GAC's booth at the convention by GAC's Barry Mervine, and that GAC's Charles Schultz emphasized to them GAC's disassociation from Viazis. (*See, e.g.,* Trial Trans. at 947–50.) Viazis also tried with less success to suggest AAO officials were present at the booth. (*See* Trial Trans. at 228.)

None of this evidence convinced the Court that there should have been an outcome here different than the one that occurred in *Lovett.* There is simply nothing sinister about AAO officials and orthodontists having been near an orthodontic manufacturer's booth at an orthodontics convention. Also, there is only the slenderest inference upon inference to suggest the orthodontists Viazis submitted as either receiving GAC's disassociation letter or attending his seminar were the complainers/threateners.[3] Nor is there any real evidence to show that the complainers colluded with each other. Even assuming Viazis' evidence sufficiently showed GAC did in fact discuss the complaints it received with orthodontists including, among others, some of the Former Individual De-

---

3. Again, Geller and Crosby denied being ma- jor GAC accounts.

fendants, persons to whom Schultz mailed his disapproval letter or attendees of Viazis' seminar, however, the Court does not believe this to create concerted action here. First, *Culberson*, 821 F.2d at 1093 (footnote omitted) (emphasis added), suggests a manufacturer's talking to complainers about their complaints is not fatal:

> [N]umerous ... authorized RCA distributors ... complained to RCA that subdistribution and transshipment [,the practices supporting the plaintiff's business,] were hurting [their] sales performance. RCA *responded* by adopting a policy against subdistribution and so *notified its distributors by letter* in February 1982. [An RCA distributor] ... then stopped supplying [the plaintiff]. [Then,] ... RCA *sent a second letter to its distributors* reaffirming its policy against subdistribution. Upon its receipt, [another distributor] stopped supplying [the plaintiff] ....

Second, GAC apparently had a practice of not advertising directly to orthodontic patients. Viazis testified that he submitted his mailer to an advertising professional suggested by GAC for review and that he only mailed the item after such review. He further suggested GAC wanted to use him as a test case. GAC denied these allegations. Crucially, for this Court's decision, however, Viazis did nothing to chip away at GAC's submission that it had not advertised directly to patients for over a decade due to problems that had arisen in the past when orthodontic manufacturers had so advertised. Specifically, orthodontists had apparently complained when products that were so advertised did not perform as promised or had other problems. The Fifth Circuit decision in *Matrix Essentials, Inc. v. Emporium Drug Mart, Inc. of Lafayette*, 988 F.2d 587 (5th Cir. 1993) makes it clear this evidence of a preexisting policy or practice undergirding a manufacturer's decision to respond in a certain way to customer complaints is sig-

nificant. *See also Culberson*, 821 F.2d at 1094.

In *Matrix Essentials, Inc.*, the policy issue appeared to be decisive. The plaintiff sued a retailer for selling products packaged for sale only by hair salons; the retailer counterclaimed on antitrust grounds. *Id.* at 589. The court dismissed the antitrust claims noting:

> It is undisputed that ever since a time long before the events at issue Matrix had a consistent policy of selling its products only through salons because this assured the concurrent availability of cosmetologist consultation, either, as Matrix has asserted, to enhance appropriate product selection, or to enhance product public image.

*Id.* at 594. Thus, even if Viazis was to be believed over GAC as to the test case issue, it was clear that GAC was uncomfortable with direct advertising long before it disassociated from Viazis.

Viazis weakly tried other means to thread GAC into his alleged conspiracy involving the AAO, SWSO or other orthodontists acting alone or as a group. Viazis contended he could implicate GAC because of the "unwritten rule" in the orthodontic industry against direct advertising. Viazis asserted:

> ... there's no end to the conspiracy under Plaintiff's theory ... [L]et's assume ... what happened was that GAC knew of this unwritten rule, which I think is clear in the record that, you know, orthodontists do not advertise comparatively, directly to the public, number one. Number two, Viazis violated the rule. Number three, GAC decided that it was going to have to punish Viazis because it knew, as Dohn says directly in the letter, Viazis was going to be subjected to peer sanction, and because GAC reasonably anticipated the loss of the—of its investment. GAC, knowing that this rule had been violated,

decided that it would sanction Viazis ... because they knew ... they would be accused of violating this rule or supporting an orthodontist who did.

Viazis appears to have argued that the Defendants' behavior for much longer than the pendency of the events at issue has not been independent but "consciously parallel" such that it is violative of antitrust law. That is, he appears to have argued that even if no *quid pro quo* collusion existed, everyone knew how to behave, and when Viazis broke that understanding, everyone acted in a parallel way designed to bring Viazis into line.[4]

*Royal Drug Co. v. Group Life and Health Insurance Co.*, 737 F.2d 1433 (5th Cir.1984) is instructive in debunking Viazis' method. There, a group of independent Texas pharmacies sued the defendant, known as Blue Shield of Texas ("Blue Shield"), under Section 1. *Id.* at 1435. The pharmacies were upset by a Blue Shield program whereby Blue Shield policyholders purchasing drugs from certain pharmacies faced reduced costs as compared to those purchasing from other pharmacies. *Id.* The reduced costs were the result of Blue Shield's entry into Pharmacy Agreements with certain pharmacies whereby those pharmacies agreed not to charge more for drugs than a set amount while Blue Shield reimbursed the participating pharmacy for the cost of acquiring the drugs. *Id.* Blue Shield would only reimburse its policy holders a certain percentage of the costs of drugs obtained from non-participating pharmacies. *Id.* The plaintiffs in the case argued the Pharmacy Agreements violated antitrust law as illegal price-fixing agreements. *Id.* at 1436.

The Fifth Circuit concluded the plaintiffs were asserting a theory of conscious parallelism and explained the showing a plaintiff must make under such circumstances. Specifically, the court wrote:

> The plaintiffs argue that even though Blue Shield does not compete with pharmacies, the uniform contracts entered into separately between competing sellers and a "powerful buyer" nevertheless constitute an illegal horizontal combination. This argument seems to assert a theory of 'conscious parallelism,' under which a combination among drugstore competitors might be established by circumstantial evidence of parallel conduct among the competitors. '[T]wo elements must be established by a plaintiff relying on a theory of conscious parallelism: (1) that the defendants engaged in consciously parallel action, (2) which was contrary to their economic self-interest so as not to amount to a good faith

---

4. In an effort to make sense of Viazis' nebulous and amorphous conspiracy theory, GAC actually submitted a discussion of conscious parallelism as applicable to one conspiracy while the customer complaint cases cited in the main text applied to another. Specifically, GAC argued: "Let's take the conspiracy that says that everyone in the orthodontic industry, including GAC and Mr. Dohn, follow an unwritten rule against comparative advertisement of apparently both products and services. What that is governed by ... is an area of the law called consciously parallel business behavior." (Trial Trans. at 1139.) Later, GAC offered: "Now, the second conspiracy that we have here ... [-] and it's not a second conspiracy but [an] alternative articu-

lation [-] ... is whether GAC and Mr. Dohn conspired with a group of its customers to injure Dr. Viazis or to restrain the bracket." (*Id.* at 1142.) "[T]he cases that are most relevant to this conspiracy ... are the children cases, the progeny of the United States Supreme Court case of *Monsanto v. Spray-Rite* [including *Culbertson* in the Fifth Circuit]." (*Id.*) Ultimately, however, all roads lead to Damascus here. The *Monsanto* line of cases appear to this Court to impact both conspiracies, or articulations of one conspiracy. They do so, as explained in the main text, in that they remove GAC and Dohn from this case because they show that as a matter of law Viazis did not demonstrate GAC acted collusively on either front.

business judgment.' *Pan–Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 559 (5th Cir.1980). In order to avoid [judgment as a matter of law] under this theory, the plaintiff cannot rely on proof of parallel behavior alone; significant probative evidence of conscious parallelism is required, 'with some 'plus' factor which tends to indicate that the asserted unilateral behavior was not such in fact . . . .' *Paul Kadair, Inc. v. Sony Corp. of America*, 694 F.2d 1017, 1027, n. 27 (5th Cir.1983). *Id.* at 1437. The court concluded the plaintiffs had failed to come forward with significant probative evidence that would have "establish[ed] a fact issue as to whether the participating pharmacies did not act according to independent exercises of their respective business judgments to increase drug sales and customer traffic." *Id.*

In light of the rules cited from *Royal Drug Co.*, the Court's discussion *supra* really takes care of any conscious parallelism argument Viazis made here. For instance, in *Lovett*, GM's actions causally stemmed from dealers upset with a fellow dealer cutting prices. Twin Cities dealers were losing business to the *Lovett* plaintiffs, because the plaintiff dealer engaged in a marketing/price discounting program luring customers from an area outside its APR. Economic common sense, and not any academic course, teaches us that in most markets most sellers prefer higher prices. They have an "unwritten rule" to keep prices as high as they can. A supplier like GM would know this. Nonetheless, the Eighth Circuit permitted GM to escape antitrust liability because its customers (dealers competing with the plaintiff) complained about the plaintiff dealer and because the record contained strong competing inferences that GM had pro-com-

petitive reasons for structuring its distribution system. Likewise, the record here could not have led a reasonable jury to believe GAC really acted against its "true" and independent will in a way contrary to its economic self-interest so as not to amount to a good faith business judgment about what was in its long-term interest.

Viazis implausibly continues his argument:

So . . ., let's say [GAC] acted alone in [dropping Viazis]. And let's say no one else is in the conspiracy at all except the AAO. The AAO could have knowingly continued the harm to the Viazis bracket by continuing the disparagement, the lockout, by sanctioning him to continue to maintain the negative feedback on Viazis and his bracket and to continue to keep the bracket marked out—locked out of the marketplace.

(Trial Transcript at 1170.) This scenario, of course, fails to acknowledge that Viazis failed to supply a connection between GAC and the AAO. Viazis presses on, however, trying to push his thin read by arguing:

. . . it would be reasonable for a fact finder to conclude that there were some orthodontists, certainly some of the[ ] orthodontists who . . . testified, who acted to disparage Viazis and the Viazis bracket, who acted to pass on without any knowledge, basis, or without any real basis this so-called ethics sanction to the AAO, and who may have threatened GAC or merely contacted GAC and said, Dr. Viazis has violated the unwritten rule and you need to do something about it.

(Trial Transcript at 1171.) Viazis simply failed to show the first element of his Sherman Act case with respect to GAC (or Dohn). Having so concluded, the Court assessed Viazis' concerted action situation with respect to the AAO and the SWSO.[5]

**5.** Viazis attempted to argue the conscious par-

allelism jurisprudence cited in the main text

■ Because unilateral action simply cannot violate Section 1, *Cranfill v. Scott & Fetzer Co.*, 773 F.Supp. 943, 950, n. 8 (E.D.Tex.1991) (citing *Monsanto Co.*, 104 S.Ct. at 1469), Viazis could have presented sufficient evidence that the AAO or SWSO conspired with someone or something else. The Court does not believe he did this. Viazis argued and presented evidence that members of the GDAO met to consider expelling Viazis from the organization based on their stated belief that his marketing methods violated the ethics of the orthodontics profession.

This was little evidence, however, that the GDAO officials schemed in some way with the SWSO or the AAO. The mere fact that GDAO members were also members of the SWSO and AAO cannot create such a scheme. In fact, the Court notes, conscious of its role *vis a vi* that of the jury, that local orthodontists concerned with a peer's marketing methods as violative of their profession's standards could be expected to pass on their complaints to a regional or national umbrella organization. This is what the members of the GDAO Viazis interrogated at trial indicated. (*See* Trial Transcript at 901.) [6]

■ As Viazis has briefly argued, however, some case law makes it appear that for antitrust purposes a trade group's sanction of a member may be, in and of itself, deemed concerted action for Sherman Act purposes. For instance, in *Na-*

*navati v. Burdette Tomlin Memorial Hospital*, 857 F.2d 96, 115 (3rd Cir.1988), Nanavati charged the Executive Committee of a hospital with having engaged in a Section 1 violation by voting to deny him staff privileges at the hospital. Despite Viazis' argument, the Court believes Viazis did not show sufficient evidence that the mere sanctioning action of the AAO here constituted the requisite concerted action. *Consolidated Metal Products, Inc. v. American Petroleum Institute*, 846 F.2d 284 (5th Cir.1988) is important to the Court's view. There:

> Consolidated Metal Products, Inc., a manufacturer of oil well equipment [ ("Consolidated") ], contend[ed] that the American Petroleum Institute ("API"), a trade association representing all sectors of the domestic petroleum industry, delayed trade standard certification to certain equipment manufactured by Consolidated and thereby excluded it from the market in violation of [S]ection 1 of the Sherman Act.

*Id.* at 286. The district court granted summary judgment and the Fifth Circuit affirmed the district court. *Id.*

In doing so, the panel noted various facts highly similar to facts and allegations in this case but most significantly, the Fifth Circuit rejected the idea that a trade association is always a "walking conspiracy." The court wrote:

is inapplicable here, because he has provided direct evidence of collusion with "the Dohn letter being Exhibit A." (Trial Transcript at 1179.) By the Court's reading of the Dohn letter, it can only reasonably be direct evidence that some of GAC's accounts threatened GAC with a withdrawal of business, Dohn believed orthodontists generally would be extremely unhappy with Viazis' marketing methods, and Dohn thought orthodontists and others involved with the profession talked to each other about matters such as those methods, spreading their views rapidly. (*See* Pl.'s

Exhibit 75.) In fact, by the Court's reading the Dohn letter cannot reasonably be read as much *indirect* evidence of collusion.

6. Interestingly, Viazis really didn't say much about the SWSO. He did note that Dr. Geller, one of the attendees at Viazis' now fabled seminar, was its president-elect at the time. Indeed, none of the parties really focused on the SWSO. The Court believes it could not have been liable here if the AAO was not. Thus, the Court has, for the most part, viewed both the AAO and SWSO in the same light.

[A] trade association by its nature involves collective action by competitors. Nonetheless, a trade association is not by its nature a 'walking conspiracy,' its every denial of some benefit amounting to an unreasonable restraint of trade. In particular, it has long been recognized that the establishment and monitoring of trade standards is a legitimate and beneficial function of trade associations.

To survive summary judgment on the issue of conspiracy, the plaintiff must present evidence that tends to exclude both the possibility of conduct consistent with permissible competition and the possibility that the alleged conspirators acted independently. API's delay in licensing its monogram ..., even if hindsight shows it to be unjustified, is not enough in itself to fall within the forbidden category. It is axiomatic that trade standards must exclude some things as substandard and it is unsurprising that standard-setting bodies sometimes err. *Id.* at 293–94 (citations omitted). The court further noted that the plaintiff offered no evidence to suggest [API's] certification program was a "mere[ ] ... ploy to obscure a conspiracy against competing producers." *Id.* at 294. The court thought the product standard at issue reasonable on its face. *Id.*

Similarly here, Viazis failed to present evidence from which a reasonable jury could have concluded the AAO's advertising rules were a mere sham designed to suppress all advertising directly to the public.

Viazis' evidence did not show the AAO's proceeding in and of itself to have been a sham anymore than Viazis has sufficiently shown the AAO to have colluded with others. Like API, the AAO may have been hasty or erred. Moreover, it is hardly inconsistent with competition for a professional medical association to wish input

into devices its members will use. The AAO does not, after all, deal with widgets. Finally, the AAO's advertising rules on their face seem eminently reasonable and in no way designed as a sham. In relevant part, they read:

> Members shall ensure that no communications are false, deceptive or misleading in any material respect when utilizing public statements, announcements of services and promotional activities for providing information to aid the public, patients and other health care providers in making informed judgments.

(Trial Transcript at 340). Hence, the Court believes Viazis not only failed to show collusion between entities, groups or individuals and a group or groups, but that he failed to make out the conspiracy element with regard to the associations acting as bodies of independent competitors.

## B. Unreasonable Restraints on Trade.

■ Even if the Court incorrectly concluded Viazis failed to sufficiently prove a conspiracy involving GAC, Dohn, the SWSO or the AAO, it believes Viazis failed to show the Defendants' actions harmed competition in the requisite manner. This is so because the jury would have to have employed a "Rule of Reason" analysis under which Viaizs provided insufficient evidence to conclude competition was harmed. Courts must make this determination as to how the fact-finder is to examine a challenged restraint's impact on competitive conditions. *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 627 F.Supp. 105, 110 (S.D.IA 1985). Usually, the Rule of Reason prevails as the analytical method. *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1362 (5th Cir. 1980). The scope of the analysis under the Rule of Reason is typically "copious" and a "full and searching" one. *See id.* The "*Per Se* Rule" exists, however, as an alter-

native mode of adjudging a restraint to be unreasonable. *Id.*

In contrast to the Rule of Reason, the *Per Se* Rule generally applies where, "the challenged action falls into the category of 'agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.'" *Northwest Wholesale Stationers, Inc.*, 472 U.S. at 289, 105 S.Ct. 2613 (citations omitted). Also, "[t]he decision to apply the *[P]er [S]e* rule [typically] turns on 'whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output ... or instead one designed to increase economic efficiency and render markets more, rather than less, competitive.'" *Id.* at 289–90, 105 S.Ct. 2613(citations omitted).

Having exposed this crucial issue, the Court notes that a recent United States Supreme Court case makes it absolutely clear that, were the AAO advertising rules and the AAO's methods of enforcing such rules, the only restraints employed here, a full Rule of Reason analysis would be appropriate. Specifically, in *California Dental Association v. Federal Trade Commission*, 526 U.S. 756, 119 S.Ct. 1604, 1609, 143 L.Ed.2d 935 (1999), the Supreme Court rejected the Ninth Circuit's use of an "abbreviated, or 'quick look,' [R]ule of [R]eason analysis designed for restraints that are not *[P]er [S]e* unlawful but are sufficiently anticompetitive on their face that they do not require a full-blown [R]ule of [R]eason inquiry." The Ninth Circuit had believed the "quick look" approach to

be proper in analyzing California Dental Association rules prohibiting "false or misleading" advertising by dentists. *Id.* at 1608–09. The Federal Trade Commission had challenged the rules as being applied in such a way as to be restrictions on truthful, nondeceptive advertising in violation of the Federal Trade Commission Act.[7] *Id.* at 1608. The Ninth Circuit's view would have allowed for condemnation of purportedly "'naked restraint[s]' on price or output without an 'elaborate industry analysis.'" *Id.* at 1609.

The Supreme Court rejected anything other than full blown Rule of Reason analysis in *California Dental Association* due to its belief that the restrictions at issue were not obviously anticompetitive and the special role of professional trade associations in regulating their professions.

That the Rule of Reason must apply to the AAO actions here is also apparent from a comparison of the facts here to those in the *California Dental Association* case. First, Dr. Viazis himself stated at trial that he had attempted to comply with the AAO's ethical canon on advertising to which he was obligated when he first began the advertising which precipitated the efforts of which he now complains. (Trial Transcript at 340.) The canon sounds strikingly like the advertising rules of the California Dental Association. Second, the AAO held a disciplinary hearing with respect to Viazis' purported violation of its advertising canons. (Trial Trans. at 396–400.) While the *California Dental Association* case involved the FTC challenging the rules of the association, those same rules provided for hearings apparently similar to the one Viazis underwent. *California Dental Ass'n*, 119 S.Ct. at 1608.

---

7. As noted in the Supreme Court's opinion, the Federal Trade Commission Act's "prohibition of unfair competition and deceptive acts or practices, 15 U.S.C. § 45(a)(1), overlaps the scope of the Sherman Act, 15 U.S.C. § 1, aimed at prohibiting restraints of trade." *Id.* at 1609, n. 3 (citation omitted).

Finally, just as Dr. Viazis was suspended for one year, California Dental Association members who were "recalcitrant" in refusing to withdraw or revise objectionable advertisements could be subject to censure, suspension, or expulsion from the association. *Id.* In fact, Dr. Viazis testified that he was offered a choice of a hearing with respect to his ads or a self-enforced punishment—the withdrawal of some of his ads. (Trial Transcript at 400–01).[8]

The allegations against GAC complicate matters just a bit, but the Court believes that ultimately the Rule of Reason would have to have been applied to the entirety of Viazis' allegations despite such involvement. Frequently, courts determine the *Per Se* Rule applies to restraints involving entities or persons in a vertical relationship acting together to boycott others competing horizontally with some of those acting together. *See Constr. Aggregate Transp., Inc. v. Florida Rock Indus., Inc.,* 710 F.2d 752, 772–76 (11th Cir.1983). Depending on the particular situation, these arrangements can be the "naked" restraints that are the target of the *Per Se* Rule. *See Id.*

This situation, however, is different. At its root, Viazis' alleged conspiracy is about the AAO, SWSO or unnamed members of the orthodontics profession acting to punish him for his supposed breach of the profession's standards of conduct. That they used GAC as one of their tools really does not change the character of their conduct. As such, the Court believes *California Dental Assoc.* is really on point even with respect to the layer of restraint GAC is charged with having added to the grand conspiracy. Indeed, in ruling

against the Ninth Circuit's quick look analysis, the Supreme Court opined:

> The truth is that our categories of analysis of anticompetitive effect are less fixed than terms like '*[P]er [S]e,*' 'quick look,' and '[R]ule of [R]eason' tend to make them appear. We have recognized, for example, that 'there is often no bright line separating *[P]er [S]e* from Rule of Reason analysis,' since 'considerable inquiry into ... market conditions' may be required before the application of any so-called '*[P]er [S]e*' condemnation is justified.

*California Dental Ass'n,* 119 S.Ct. at 1617 (citations omitted).

A logical "extension" of the *California Dental Association* case is not alone, however, in suggesting this is in no way a *Per Se* case. *Northwest Wholesale Stationers, Inc.,* 472 U.S. at 294, 105 S.Ct. 2613 (citations omitted) teaches:

> Cases to which [the Supreme Court] has applied the *[P]er [S]e* approach have generally involved joint efforts by a firm or firms to disadvantage competitors by 'either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle.'

Also, "[i]n these cases, the boycott often cuts off access to a supply, facility, or market necessary to enable the boycotted firm to compete ... and frequently the boycotting firm possessed a dominant position in the relevant market." *Id.* (citations omitted). Finally, "the practices [at issue] were generally not justified by plausible arguments that they were intended to enhance overall efficiency and make markets more competitive." *Id.* The question then,

---

**8.** Viazis testified he did not know at the time he was given a choice between accepting punishment or having a hearing over what the punishment would be; he only later learned through discovery that had he accepted punishment, there would have been a recommendation of punishment consisting of the withdrawing of some of his ads. (Trial Transcript at 400).

should be whether GAC was a relationship, essential facility or firm possessing market power that Viazis needed in the competitive struggle.[9] As the Court's discussion *infra* concerning the mechanics of the Rule of Reason shows, it could not have been such a relationship.[10]

 Having concluded the Rule of Reason applied here, the Court turns to a discussion of what Viazis was required to show under it before proceeding to illustrate his failure to do so. Under the rule, Viazis had to have presented sufficient evidence that the Defendants' actions "had an anticompetitive effect in the relevant market." *Muenster Butane, Inc. v. Stewart Co.*, 651 F.2d 292, 295 (5th Cir.1981). Because Viazis claimed in the Joint Pre-trial Order at 6 that the "Viazis' [sic] bracket has been cut-off from the market for orthodontic brackets," he was required to present a threshold level of evidence on the competitive harm to such orthodontic brackets market.[11]

 The competitive harm to a relevant market necessary to make out an antitrust violation involves several key facets. Significantly, the required showing under the Rule of Reason does not concern itself with effects on a particular plaintiff, but, rather with effects on the *relevant market* as a whole. *See Muenster Butane, Inc.*, 651 F.2d at 296. Further:

> In order to prove an anticompetitive effect on the [relevant] market, the plaintiff may either prove that the defendants' behavior had an "actual detrimental effect" on competition, or ... define the relevant market and establish that the defendants possessed power in that market.

*Levine v. Central Florida Medical Affiliates, Inc.*, 72 F.3d 1538, 1551 (11th Cir. 1996) (citations omitted). Finally, actual detrimental effects in a given market are typically shown by proving an increase in prices in such market or a reduction in output; reduction in output encompass changes in both quantity and quality of output. *See, Federal Trade Comm'n v. Indiana Fed. of Dentists*, 476 U.S. 447, 106 S.Ct. 2009, 2018-19, 90 L.Ed.2d 445 (1986); Alan J. Meese, *Farewell to the Quick Look: Redefining the Scope and Content of The Rule of Reason*, 68 ANTITRUST L.J. 461, 494 (2000); Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, Volume XI, ¶ 1912c4, Pg. 290—294.

Viazis made neither showing described in *Levine* with the requisite force. First, Viazis did not make a sufficient showing of

---

9. The Court notes that orthodontists were not competitors of Viazis in the orthodontics bracket market. That is, they competed with him in providing orthodontic services. Viazis claimed damages, however, in the orthodontics bracket market. Thus, a common indicator of a *Per Se* situation, defendants competing with a plaintiff in the allegedly harmed market, is missing here.

10. The court notes Viazis submitted two cases for the proposition that the use of a trade group to effect a group boycott has been termed a *Per Se* violation. *See Radiant Burners, Inc. v. Peoples Gas Light and Coke Co.*, 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961) and *Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963). The Court reviewed these cases, and as a preliminary matter, believes them to be distinguishable. Moreover, the much more recent *California Dental Association* and *Northwest Wholesale Stationers, Inc.* cases clearly indicate that this is a Rule of Reason case.

11. Plaintiff must make this showing with respect to a relevant product market and geographic market. *Muenster Butane, Inc.*, 651 F.2d at 295. Plaintiff stated at trial that one of his contested issues of fact and law was "whether the geographic market in issue [was] ... the world." (Joint Final Pre-trial Order at 11). Based on the argument at trial, the Court concluded that the relevant geographic market is the world.

harm on the basis of a marketwide output reduction. To be sure, the record contains evidence that the Viazis bracket may be a unique and innovative new type of orthodontic device exceeding, in some senses, the quality level of competitive products. If a sufficient showing were made suggesting that such a quality product was either completely or substantially kept off the market, then, it might be reasonable for a jury to conclude market wide output had been impacted either from a quantity or quality standpoint.[12] Viazis did not, however, introduce sufficient evidence that his brackets were either completely or substantially excluded from the orthodontics bracket market. It is this Court's belief that at most, Viazis may have established that (a) on the seller side of the market,[13] Defendant GAC, which no longer distributes his product, has anywhere from 14–20% share of the brackets market, and (b) on the buyer's side that most orthodontists are not currently buying his brackets.

One problem for Viazis is that even if GAC held a large market share, the vast majority of the worldwide distribution chain in such market was open to him. Viazis tried to counter by offering testimony from various persons that suggested distributors representing the vast majority of the sellers in the brackets market would not work with Viazis. For example, testimony was offered regarding a letter Dohn wrote to Viazis where Dohn stated: "[Y]ou can be sure that GAC's competitors, especially Ormco, will not only spread [news of GAC's affiliation with comparative adver-

tiser Viazis] but distort it to their advantage." (Trial Transcript at 225). Viazis himself testified that he was a pariah to the orthodontic appliance manufacturers and distributors. Viazis presented no evidence, however, that he went to other distributors. Moreover, evidence offered at trial showed that Viazis did in fact have brackets market access.

Such evidence suggested that Viazis' bracket thrived in the brackets market such that marketwide output was not harmed quantitatively or qualitatively. For one, Viazis has had a relationship with new companies marketing primarily to dentists that have acted as his distributors since GAC stopped functioning in such capacity. (Trial Transcript at 415.) Additionally, Viazis acknowledged at trial that under his present manufacturing arrangement with GAC and his new distribution chain, he makes speaking appearances promoting his brackets, advertises his product, and sees his brackets distributed overseas as well as in the United States. (Trial Transcript at 455–57, 570–72.) Further, he acknowledged that his revenues from bracket sales have climbed since GAC "dropped" him. (Trial Trans. at 457–58, 588.)

Indeed, case law also suggests Viazis' attempts to show exclusion were hollow. First, the *Levine* court rejected a claim by a doctor that his being excluded from certain but not all healthcare delivery entities in a certain geographic market for physician services restricted competition. *Le-*

---

12. This would be the case, because total or near total exclusion of a truly innovative product could have two market wide output detrimental effects: (a) insulating other products already in the market from quality-based competition or (b) preventing introduction of an item that could stimulate interest in the product category as a whole thereby suppressing production of the item in the market as a whole.

13. The parties do acknowledge that the brackets market largely consists of manufacturers/distributors on one side as sellers and medical professionals—orthodontists and dentists—on the buyer's side (Trial Transcript at 570). The ultimate recipients of orthodontic brackets, the patients, participate in the market for orthodontic services.

*vine,* 72 F.3d at 1551. In doing so, the Levine court wrote that: "Although Healthchoice and CFMA denied him membership, Dr. Levine had no trouble establishing a booming practice." *Id. Consolidated Metal Products, Inc.,* 846 F.2d at 295–96 also hurts Viazis' harm to competition case. There, the court acknowledged "the API monogram is very important to buyer acceptance of [Consolidated's equipment]." *Id.* at 295. The court noted, however, that there was no evidence API forced buyers of oil field equipment to refrain from buying non-certified equipment. *Id.* at 296. Also:

> Although there is some danger that API could use its influence to reduce competition, this danger is small so long as users rely voluntarily upon the API monogram. If users choose freely to rely on API approval, API has influence principally because it has done a good job evaluating products. If API fails to evaluate products accurately, consumers free to sample non-monogrammed goods will gradually discover the monogram's diminished usefulness and cease relying on it. Thus, the greatest threat to competition is in the sort run, before a significant number of buyers shop around. Even this threat is mitigated to the extent that producers of unmonogrammed equipment have alternative means of reassuring consumers of the quality of their products. They may, for example, offer warranties, commission product tests by someone other than API ....

Here, however, Consolidated had no trouble gaining acceptance of its product even in the short run; it was able to sell substantial amounts of its [product] as soon as production began.

*Id.* at 296–97.

Viazis openly admitted that dentists are customers in the brackets market and that he is having phenomenal success in selling to them; he thus eroded his ability to claim he has been excluded from the relevant market.

In addition to not showing an impact on marketwide output by means of a lockout or otherwise, Viazis failed to make a sufficient showing of harm to competition based on proof relating to prices in the orthodontic brackets market. In fact, as a preliminary matter, one of Dr. Viazis' witnesses, a dentist using his brackets, testified that Viazis' brackets actually cost more than other brackets. (Trial Transcript at 707.) Viazis did, however, offer expert testimony regarding the effect of the rapid diffusion of the Viazis bracket on the price and quality of competing metal brackets. His expert agreed in response to a question at trial that "the conduct of Defendants ... harmed consumers in [the orthodontic brackets market]," and that consumers in the bracket market would be harmed by "the suppression of a cost saving innovation." (Trial Transcript at 859–69.) This testimony was not sufficient, however, because it offered nothing more than bare conclusions. Per the United States Supreme Court in *Brooke Group, Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 113 S.Ct. 2578, 2598, 125 L.Ed.2d 168 (1993), "[w]hen an expert opinion is not supported by sufficient facts to validate it in the eyes of the law ... it cannot support a jury's verdict." [14]

---

14. Viazis did offer evidence that suggested harm to consumers in the orthodontic services product market, but unfortunately none of it explained the relationship of such harm to the brackets market. Several of his witnesses suggested that Viazis' brackets were such innovative orthodontic appliances that they would substantially reduce the time patients would have to spend in orthodontic treatment, and thereby lower overall costs of such treatment. An argument could be made that such lower costs would stimulate demand for such services and thereby affect the demand for products serving as inputs to producing orthodontic services such as brackets. Unfortunately for Viazis, none of those witnesses explained this relationship.

As discussed *supra, Levine* demonstrates that Viazis could have alternatively showed competitive harm through a showing of the Defendants' market power. Again then, GAC did not control more than 20% of the brackets market and Viazis admits exclusion from that portion of the market would not be sufficient to show the requisite harm to competition. (Trial Transcript at 1177.) Consequently, Viazis had to make a sufficient showing of the AAO's market power in the orthodontic brackets market. *Realty Multi–List, Inc.,* 629 F.2d at 1370 (citation omitted) provides guidance on showing association market power. There, the court found two factors key to finding such power: "First, one can access the degree to which the association is involved in its member's business ...," and "[s]econd, one may determine whether the association possesses sufficient economic power 'to shape and influence the economic environment of [the] particular field involved.'"

Viazis presented insufficient evidence of the SWSO/AAO's market power. As noted *supra,* he did offer evidence from Dohn that the AAO has tried to insinuate itself into the orthodontics equipment market by pre-approving products. Dohn stated, however, that the orthodontic manufacturers had resisted the AAO's efforts. Moreover, any influence on the brackets market the AAO wields by virtue of its membership consisting of the buyers' side of the brackets market is to be expected and natural. Of course, a trade association will always have some influence on its members' perceptions. API did in *Consolidated Metal Products, Inc.* and so did the AAO here. Such common sense, however, is not proof that the AAO so shaped the brackets market that Viazis demonstrated an unreasonable restraint on trade. Finally, the Court is reminded by the United States Supreme Court that "an inquiry into market power ... is but a 'surrogate for detrimental effects.'" *Indiana Fed. of*

*Dentists,* 106 S.Ct at 2019. The idea that a jury could have found competition in the brackets market was harmed by the AAO's market power then, is simply overwhelmed by the contrary proof discussed *supra.*

Before concluding, however, the Court briefly addresses Viazis's responses to Defendants' harm to competition arguments. As a major part of this, Viazis asserted *Indiana Federation of Dentists.* Mostly, he appeared to argue that the case, along with other cases, stands for the proposition that actual exclusion from a relevant market obviates the need for a plaintiff to show detrimental effect or a defendant's market power. The proposition is logical enough.

Unfortunately for Viazis, an examination of the case demonstrates Viazis could not rely on it or others like it. In the case, a group of dentists banded together in a federation which promulgated a rule that *no* member could submit patient x-rays to dental insurers in conjunction with claim forms. 106 S.Ct. at 2013–14. *Nearly 100%* of the dentists in certain local communities belonged to the federation. *Id.* at 2019. The Federal Trade Commission found a violation of Section 5 of the Federal Trade Commission Act based on the notion that the federation's rule amounted to an illegal Sherman Act Section 1 conspiracy. *Id.* The commission found anticompetitive effect even without a showing that the rule led to higher costs to insurers or patients, *Id.* at 2014–15, but the Seventh Circuit reversed the FTC, because the court felt the record lacked key indices of competitive harm. *Id.* at 2015.

While the Supreme Court disagreed with the Seventh Circuit, *Id.* at 2016–17, a careful reading of the Supreme Court's *Federal Trade Commission* decision does not, however, weaken this Court's analysis here. The Supreme Court found that "no elaborate industry analysis [was] required to demonstrate the anticompetitive charac-

ter of . . . [the] agreement [at issue]," because "[a]bsent some countervailing procompetitive virtue . . . such an agreement . . . [could not] be sustained under the Rule of Reason." *Id.* at 2018. The Supreme Court further explained that: "[A]s a matter of law, the absence of proof of market power does not justify a naked restriction on price or output." *Id.* at 2019. It noted, however, that even if the Indiana federation agreement was not "naked" enough, "[f]ederation dentists constituted heavy majorities of the practicing dentists and that . . . insurers [in the areas populated by federation dentists] were . . . *actually unable to obtain compliance with their requests* for . . . x-rays." *Id.* (emphasis added). Finally, the Supreme Court rejected the Indiana dentists' argument that the FTC had failed to show increased dental costs, because:

> A concerted and effective effort to withhold . . . information desired . . . for the purpose of determining whether a particular purchase is cost justified is likely enough to disrupt the proper functioning of the price-setting mechanism of the market that it may be condemned even absent proof that it resulted in higher prices . . . .

*Id.*

As the Supreme Court's statements make apparent, the Supreme Court viewed the factual record as facially showing the Indiana dentists with market power, output in the relevant market actually being reduced, and costs likely having been increased. In other words, it was obvious that when almost 100% of the dentists there were engaged in the effort to prevent insurance companies from receiving the cost analysis x-rays they had specifically desired, output and price in the relevant marker were impacted. The Court's lengthy discussion *supra* shows no such similarly transparent situation here. In fact, most of Viazis's other citations in response to the Defendants' motions on harm to competition are more of the same, and, thus, the Court will not take up more space in the body of this already lengthy opinion and order to expose their failure to alter the Court's decision.[15]

---

**15.** First, in *Re/Max International, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1002 (6th Cir. 1999), the plaintiffs accused the defendants of, among other things, a Sherman Act Section 1 violation. Specifically, Re/Max accused two local northeast Ohio real estate agencies of conspiring against Re/Max by offering Re/Max agents a lower split of commissions from sales of homes listed by the agencies to buyers represented by the Re/Max agents. *Id.* Although the Sixth Circuit ultimately held against Re/Max on its Section 1 claim, as with *Indiana Federation of Dentists*, there had been a much more obvious showing of market power in the record than that present here. *Id.* at 1003, 1015. Second, in *Realty Multi-List, Inc.*, 629 F.2d at 1357–58, the United States challenged the membership criteria of a multiple listing service in Muscogee County Georgia as being violative of Section 1. Viazis's counsel pointed the court to the Fifth Circuit's statement that:

> While '[t]he issue of market power is inescapably present in any inquiry about impact on competition,' . . . the question before us is not whether [the listing service] has a monopoly in the relevant market; rather we must determine whether [the listing service] is of 'sufficient economic importance that exclusion results in the denial of the opportunity to compete effectively on equal terms.'

*Id.* at 1373 (citations omitted). Apparently, Viazis hoped to suggest that GAC or the AAO were sufficiently important to his efforts to sell into the orthodontic bracket market that their actions denied him the opportunity to compete in such market. It is obvious the Court's discussion in the main text makes plain that this language could not have saved Viazis' harm to competition case. Finally, the rest is more of the same. These include: a case having no precedential weight because it was vacated pursuant to a settlement agreement, *Great Western Directories, Inc. v. Southwestern Bell Telephone Co.*, 63 F.3d 1378, 1386 (5th Cir.1995), *modified*, 74 F.3d 613, *vacated pursuant to settlement agreement* (August 21, 1996), *cert dismissed*, 518 U.S. 1048,

## C. INJURY IN FACT

Finally, the Defendants base their motions on Viazis' alleged inability to demonstrate that any injury he suffered was attributable to their conduct. GAC and Dohn argued that Viazis' injuries could not be attributed to any alleged antitrust violations because Viazis agreed to restructure his relationships with GAC in an agreement signed in mid–1997, but effective January 1, 1997. That is, they claimed Viazis' damages are based on revenues he would have received had his old contractual relationship with GAC remained in place and had his sales to large numbers of orthodontist customers continued. (Trial Transcript at 154–56.) The SWSO and the AAO agree with this but also note their belief that the modification also meant that their disciplinary actions could not have caused Viazis any losses. (Trial Transcript at 1136.)

The Court did not agree with Defendants because it believes Viazis' case with respect to this third element is inextricably linked to his concerted action charges. In this regard, the Court notes that if GAC is taken out of the conspiracy, a reasonable jury could not have found the requisite causation against the associations. Viazis' and others' testimony made clear that any orthodontist refusal to deal with Viazis was accomplished before the AAO's disciplinary process against him was materially underway. First, Viazis sent his mailer and held his Plano seminar, which various Plano orthodontists attended at the beginning of May 1996. Second, GAC's Dohn wrote Viazis the letter that presaged the disassociation between Viazis and GAC on May 8, 1996. Third, Viazis lost his initial agreement with GAC in an agreement effective as of January 1997. Fourth, the GDAO forwarded its complaint to the AAO in June 1997.[16] Fifth, the AAO notified Viazis of its involvement in July 1997. Sixth, a hearing on Viazis' case was held in November 1997. Finally, Viazis' suspension began in December 1999.

It is from the date of the Plano seminar and the Dohn Letter that Viazis has argued his troubles with orthodontic manufacturers and orthodontists and hence his lockout from the market essentially began. Indeed, Viazis testified that from 1997 onward, he had lost virtually all his orthodontist customers. (Trial transcript at 592–93). Thus, a reasonable juror could not find that Viazis was locked out of the orthodontics bracket market based on the refusal of sellers or buyers in that market to deal with Viazis arising out of any formal AAO action as he was already "locked out."

If GAC did collude with the AAO, however, or colluded with orthodontists acting independent of the AAO in a conspiracy the SWSO and AAO later joined, the Court believes he presented sufficient evidence of causation against all the Defendants. This is so because any serious efforts to restructure the relationship did not come until September 1996 when Viazis wrote a letter to GAC suggesting a voluntary restructuring of the relationship would be mutually beneficial. Of course, Viazis now claims he did not mean to suggest he was truly voluntarily desirous of changing his arrangements with GAC.

---

117 S.Ct. 26, 135 L.Ed.2d 1120, *Fineman v. Armstrong World Indus.*, 980 F.2d 171 (3rd Cir.1992); *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421 (9th Cir.1995); *Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325 (7th Cir.1986).

**16.** Viazis testified that the GDAO actually met shortly after his seminar in 1996. He ac-

knowledged that a motion to expel him from the GDAO was tabled at such meeting. (Trial Transcript at 542). Further, Viazis agreed that the GDAO's Claude Stephens actually wrote the AAO about Viazis in June 1997. (*See id.* at 543.)

The Court does not believe this to be crucial, however, because it believes Viazis presented evidence that GAC essentially restructured the relationship by failing to adhere to contractual terms in place long before its agreements with Viazis were formally and completely restructured. Indeed, Viazis' presentation of evidence that he lost the orthodontist portion of the market for orthodontic brackets before the parties provided for the marketing relationship to change makes this apparent. (*See* Trial Transcript at 458.)

## IV. CONCLUSION.

Because Viazis failed to show the requisite concerted action by GAC, Dohn, the SWSO or the AAO or harm to competition in the orthodontic brackets market, a reasonable jury could not find for him on his one and only claim remaining against the Defendants. Consequently, such claim is dismissed with prejudice.[17]

IT IS SO ORDERED.

---

**17.** It should be noted that the Court received a letter dated June 6, 2001 from Viazis' counsel wherein such counsel submitted that this Court should "reconsider its oral pronouncement of its intention to dismiss this action," in light of *Spectators' Communication Network, Inc. v. Colonial Country Club,* 253 F.3d 215 (5th Cir.2001). He failed to illuminate the Court as to what specifically in this case should change the Court's "mind." Nonetheless, the Court has reviewed the case, and presumes Viazis has called attention to this holding: "[T]here can be sufficient evidence of a combination or conspiracy when one conspirator lacks a direct interest in precluding competition, but is enticed or coerced into knowingly curtailing competition by another conspirator who has an anticompetitive motive." *Id.* at 222. This language does not detract from the Court's analysis and application of other antitrust precedent. Indeed, the Court's opinion is a lengthy way of showing, based on precedent such as the *Culberson* case and others, that sufficient evidence was not presented to show that GAC was coerced or enticed by anyone into disassociating from Viazis.